Filed:  April 26, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Respondent on Review,

v.

MICHAEL WAYNE MISKELL,

Petitioner on Review.

(CC 08C46146; CA A140390 (Control))

_____

STATE OF OREGON,

Respondent on Review,

v.

ANTHONY CORNELL SINIBALDI,

Petitioner on Review.

(CC 08C46147; CA A140391; SC S059326)

On review from the Court of Appeals.*

Argued and submitted November 10, 2011.

Anne Fujita Munsey, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for petitioners on review.  With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Matthew J. Lysne, Assistant Attorney-in-Charge, Salem, argued the cause and filed the brief for respondent on review.  With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.**

BALMER, J.

The decision of the Court of Appeals and the judgment of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

*Appeal from Marion County Circuit Court, Albin W. Norblad, III, Judge. 239 Or App 629, 246 P3d 755 (2010).

**Landau, J., did not participate in the consideration or decision of this case.

BALMER, J.

Defendants seek review of a Court of Appeals decision affirming their convictions for aggravated first-degree theft, ORS 164.057, and second-degree burglary, ORS 164.215. We allowed their petition for review to consider one of the issues defendants raised in their consolidated appeal: whether the trial court erred in denying defendants' motion to suppress an audio recording of a conversation between defendants and a police informant, which the police made without first obtaining a court order. We conclude that the police acted unlawfully in failing to seek a court order under ORS 133.726 before intercepting and recording the conversation, and that the recording should have been suppressed. We further conclude that the error was prejudicial. Accordingly, we reverse and remand to the trial court for further proceedings.

## I. FACTUAL BACKGROUND

For purposes of our review, the facts are undisputed. On Thursday, July 24, 2008, Salem police received a report that a store in south Salem, Aaron's Furniture and Electronics, had been burglarized the night before. A police detective, Abel, was assigned to the case. At 4:00 p.m. on Friday, July 25, Detective Abel was told by his supervisor that a woman named Crystal Maynard, who was in custody in the Marion County Jail, claimed to have information about the burglary at Aaron's. Abel went to the jail to interview Maynard. In the course of the interview, Maynard told Abel that defendants had committed the burglary, had brought the stolen property to her apartment on the night of the burglary, and had removed it all from her apartment the next day. Maynard provided Abel with a detailed description of the items -- computers and

1

televisions -- that defendants had stolen. Abel obtained a list of the items that had been reported missing by Aaron's, and, according to Abel, the list matched Maynard's description "exactly."

Maynard had been arrested earlier in the day on a warrant for failure to appear, and for possession of methamphetamine, at the apartment she shared with her boyfriend, Alcaraz. She was released from custody (after being cited for those crimes) shortly after her meeting with Abel. By the time she was released, Maynard had agreed to act as an informant for the police in a "sting" operation, the details of which had yet to be determined, to obtain evidence of defendants' alleged involvement in the burglary. At that point, Abel was considering some kind of audio visual surveillance of the operation "in very broad terms," and he called in another police detective, Bethers, who had more experience with electronic surveillance. Detective Bethers initially considered trying to arrange a "buy bust" -- a controlled and recorded purchase of some of the stolen property from defendants -- but knew that the operation would have to be "fluid" and would depend on a number of factors, including whether and when Maynard would be able to get in touch with defendants. Bethers, Abel, and Maynard spent the evening of July 25 together, talking about various scenarios and "try[ing] to make some phone calls" to defendants. Maynard was not able to reach either defendant that night, but left a few messages for them. Abel and Bethers eventually decided to terminate the investigation for the night, and Abel turned the investigation over to Bethers. Because it was a Friday and Bethers was not scheduled to work over the weekend, he gave Maynard his cell phone number and instructed her to call him at that number if either of the suspects

returned her calls. He then allowed Maynard to go home.

At 11:00 a.m. the next morning, Maynard called Bethers. She told him that, at 2:00 a.m. that morning, someone had knocked on her door and then tried to break in. She went on to say that she was afraid that defendants

"were after her trying to get some of their [stolen] property from the residence. She continued that she had also received a piece of property from * * * a person known to her as Jeremy that had [been] purchased for $500 from [defendants], but she had gotten it back because it didn't work and that * * * she was supposed to get it back to [defendants]."

Bethers was in Portland with his family and it was not possible for him to immediately go to Salem. He told Maynard he would call her back around 5:00 p.m.; he eventually met her at a restaurant in Salem at 5:30 p.m. When they met, Maynard had the property that she had spoken of -- a laptop computer. Bethers confirmed that the laptop was on the list of items that Aaron's had reported as missing.

Maynard told Bethers that she was afraid to return to her residence, so he obtained a room for her in a hotel. Bethers decided that, in light of what he had just learned from Maynard, his original plan for a "buy bust" would not work, because defendants seemed to be focused on getting the stolen property back, rather than selling it. Bethers concluded that "the best way of doing this now was to * * * get ahold of [defendants] and monitor the conversation between them as [Maynard] returned the laptop back to [defendants]." In furtherance of that plan, Bethers contacted his sergeant, who arranged a 7:30 p.m. briefing with other officers who would help in the operation. After the briefing, Bethers wired Maynard's hotel room for video and audio interception. At 8:38 p.m., Bethers directed Maynard to call defendants. Defendants did not answer

3

that call, but defendant Miskell called back at around 9:15 p.m. During the telephone conversation, which was recorded, defendant Miskell asked Maynard if she had "any of the stuff." She replied that she had the laptop and that he and defendant Sinibaldi could come to the hotel to get it. Defendants arrived at Maynard's hotel room a few minutes later and had an extended conversation with her there, which Bethers and other police officers intercepted and recorded.

Bethers instructed other police officers to stop defendants as they drove out of the hotel parking lot after their meeting with Maynard. When they were stopped, defendants had in their possession the stolen laptop, which Maynard had given to them, and another laptop computer that police were able to identify as one of the items that had been taken in the burglary. Defendants were arrested; later, in a joint indictment, each was charged with one count of aggravated theft in the first degree, ORS 164.057, and two counts of burglary in the second degree, ORS 164.215.

## II. PROCEEDINGS BELOW

Before their trial on those charges, defendants jointly moved to suppress the audio recording that Bethers had made of defendants' conversation with Maynard in the hotel room, along with a transcript of the conversation, on the ground that the police unlawfully had intercepted the conversation without obtaining a court order authorizing them to do so. Defendants primarily relied on ORS 133.726, which we set out below, a statute that generally requires a law enforcement officer to obtain an *ex parte* order before

4

intercepting "an oral communication to which the officer or a person under the direct supervision of the officer is a party."[1] In orally arguing the motion, the parties focused on whether the police were excused from obtaining an *ex parte* order under ORS 133.726(7)(b), which provides that no *ex parte* order is required when the police have probable cause to believe that the person being targeted is or has been involved in a crime that is punishable as a felony and "the circumstances at the time the oral communication is intercepted are of such exigency that it would be unreasonable to obtain a court order under [ORS 133.726]." After hearing the testimony of Abel and Bethers, and another police officer involved in the events leading up to the interception of the hotel room conversation (which testimony is reflected in the summary above), the trial court denied defendants' motion, apparently agreeing with the state's "exigency" argument.[2]

At the jury trial that followed, the state's evidence included: (1) testimony from various witnesses about the burglary and the items that were stolen; (2) a store surveillance video of the burglary, showing two men who could have been defendants engaged in stealing televisions and computers; (3) Maynard's testimony about the burglary and its aftermath, including statements that she initially had lied to Abel and Bethers about her lack of involvement in the crime, that she and Alcaraz in fact had acted

---

[1]     Defendants also raised the prohibitions on unreasonable searches and seizures in Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.

[2]     The court explained, very briefly, that "I can see that there [were] circumstances that did not allow for the search warrant."

5

as lookouts for defendants during the burglary, and that defendants initially had brought the stolen items to Maynard's and Alcaraz's apartment, but had left the next day in a huff after arguing with Alcaraz, taking what remained of the stolen goods with them; (4) testimony by Maynard's friend, Hicks, that defendants were at Maynard's apartment on the day after the burglary, along with a number of televisions and computers that she had never seen before, and that defendants had left with the televisions and computers after arguing with Alcaraz; (5) testimony by a police officer that one of the stolen televisions had been recovered from the person who, according to Maynard's testimony, had purchased it from defendants; and (6) testimony by a police officer that, when defendants were arrested as they left the hotel where Maynard was staying, they had in their possession the stolen laptop that Maynard had given to them and another computer that was identified as having been stolen from Aaron's.

The state also introduced the recording of the hotel room meeting between Maynard and defendants, along with a transcript of the conversation. The conversation at that meeting centered primarily on defendants' irritation with Alcaraz for taking a computer monitor without defendants' permission and for opening the door of his and Maynard's apartment when the police had arrived the previous day on the unrelated failure-to-appear matter. In the course of the conversation, defendant Miskell told Maynard that he would say to Alcaraz, "[Y]ou don't rip me off, especially when I hook you up with what we do."

The jury found both defendants guilty of the charged offenses, and the trial court entered judgment in conformity with the verdicts. In their consolidated appeal,

6

defendants challenged the denial of their motion to suppress on both statutory and constitutional grounds. The Court of Appeals affirmed without opinion. *State v. Miskell/Sinibaldi*, 239 Or App 629, 246 P3d 755 (2010).

III. INTERPRETATION OF "EXIGENCY" EXCEPTION OF ORS 133.726(7)

On review, defendants again challenge the denial of their motion to suppress and again rely on ORS 133.726 and Article I, section 9, of the Oregon Constitution. As is our ordinary practice, we consider the statutory argument first. *State v. Lowry*, 295 Or 337, 343, 667 P2d 996 (1983).

ORS 133.726 is part of a larger statutory scheme that governs the interception and recording of private conversations. At the center of the scheme is ORS 165.540, a statute that, with certain relevant exceptions, prohibits the interception of such conversations unless all of the parties to the conversation "are specifically informed that their conversation is being obtained." ORS 165.540(1)(c).[3] By statute, evidence obtained in violation of the prohibition set out in ORS 165.540 is inadmissible in court,

---

[3]    ORS 165.540(1)(c) provides:

"Except as otherwise provided in ORS 133.724 or 133.726 or subsections (2) to (7) of this section, a person may not:

"* * * * *

"(c) Obtain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if not all participants in the conversation are specifically informed that their conversation is being obtained."

7

except as evidence of unlawful interception. ORS 41.910(1). ORS 133.736(1) provides the mechanism for challenging a violation of the statutory court order requirement set out in ORS 133.726:

> "Any aggrieved person in any trial, hearing or proceeding in or before any court * * * may move to suppress recordings of any oral communication intercepted in violation of ORS 133.726 or testimony or other evidence derived solely from the unlawful interception."

There are several exceptions to the prohibition set out in ORS 165.540, which the statute expressly recognizes in the introductory phrase: "Except as otherwise provided in ORS 133.724 and ORS 133.726 or subsection (2) to (7) of this section * * *." The two exceptions that are relevant in this case, ORS 133.724 and ORS 133.726, are statutes that provide for the issuance of two different kinds of court orders authorizing law enforcement personnel to intercept or record communications without violating ORS 165.540. ORS 133.724 provides a process for obtaining a court order permitting wiretapping or other forms of interception of a wire, electronic, or oral communication in which *no* party to the communications is aware of the interception. That statute requires a detailed, written application, "made upon oath or affirmation of the individual who is the district attorney or a deputy district attorney * * * for the county in which the order is sought," and authorizes a court order only if the court finds probable cause to believe that the person targeted is involved in certain specified crimes and that "normal investigative procedures" would not succeed or would be too dangerous. ORS 133.724(1), (3). ORS 133.724 does not provide an "exigency" exception, or any other exception, to the court order requirement.

8

ORS 133.726, on the other hand, provides for an *ex parte* order that is considerably less difficult to obtain than the order described in ORS 133.724.  Such an order is authorized when a law enforcement officer wishes to wear a body wire in a "sting" operation or to otherwise intercept an oral communication "to which the officer or a person under the direct supervision of the officer is a party."  ORS 133.726(1), (3).  In other words, ORS 133.726 applies when at least one party to the communication -- either an officer or a police-supervised informant -- is aware of the interception.

ORS 133.726 is the relevant statute in this case.  It provides, in part:

"(1) Notwithstanding ORS 133.724, under the circumstances described in this section, a law enforcement officer is authorized to intercept an oral communication to which the officer or a person under the direction supervision of the officer is a party, *without obtaining an order for the interception of a wire, electronic or oral communication under ORS 133.724*;

"(2) For purposes of this section and ORS 133.736, a person is a party to an oral communication if the oral communication is made in the person's immediate presence and is audible to the person regardless of whether the communication is specifically directed to the person;

"(3) An ex parte order for intercepting an oral communication * * * under this section may be issued by any judge as defined in ORS 133.525 upon written application made * * * upon oath or affirmation of any peace officer as defined in ORS 133.005.  The application shall include:

"(a)-(e) [setting out application requirements];

"(4) [setting out court's authority to require further evidence in support of application for *ex parte* order];

"(5) [setting standards for issuance of the described *ex parte* order];

"(6) [setting out required contents of *ex parte* order];

"(7) An order under ORS 133.724 or this section *is not required* when a law enforcement officer intercepts an oral communication to which

9

the officer or a person under the direct supervision of the officer is a party *if the oral communication is made by a person whom the officer has probable cause to believe has committed, is engaged in committing or is about to commit*:

"(a) A crime punishable as a felony under [specified drug crime statutes] or as a misdemeanor under [specified prostitution statutes]; or

"(b) *Any other crime punishable as a felony if the circumstances at the time the oral communication is intercepted are of such exigency that it would be unreasonable to obtain a court order under ORS 133.724 or this section*[.]"

(Emphasis added.) Thus, to intercept a conversation involving a police officer or a police-supervised informant, the police generally must obtain an *ex parte* order as described in ORS 133.726(3) to (6), but need not meet the stringent requirements described in ORS 133.724. Moreover, the police are excused from obtaining an order under ORS 133.726 if (of particular relevance here) they have probable cause to believe that their target has committed, is committing, or is about to commit, a felony, and that the circumstances at the time of the interception "are of such exigency that it would be unreasonable to obtain a court order." ORS 133.726(7). The state relies here on that "exigency" exception to the otherwise applicable court order requirement of ORS 133.726.

The issue here is: what did the legislature intend to convey by the phrase "circumstances * * * [that] are of such exigency that it would be unreasonable to obtain a court order"? ORS 133.726(7)(b). Defendants contend that the wording is an obvious reference to the "exigent circumstances" exception to the warrant requirement under both the Oregon and federal constitutions -- and thus that "exigent circumstances" are limited

10

to the kinds of circumstances that, in the words of this court, "require[] the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).[4] Defendants assert that those circumstances were not present here, that the interception thus did not come within the exception to ORS 133.726(7), and that the recording that resulted from the interception was obtained in violation of ORS 165.540 and was inadmissible under ORS 41.910(1).  The state contends, on the other hand, that the words have no connection to the "exigent circumstances" concept that courts have used in analyzing the constitutionality of warrantless searches, and that, in fact, the words encompass a range of law enforcement exigencies or "needs" -- including the simple need to collect evidence -- that might make obtaining a court order prior to intercepting a conversation "unreasonable."  The intercepted communications, the state argues, were thus lawfully obtained and admissible.

Looking solely at the words that are at issue does not resolve the controversy.  As the state points out, the word "exigency," in ordinary parlance, may

---

[4]     It appears that, although the United States Supreme Court has recognized an "exigent circumstances" exception to the warrant requirement in the Fourth Amendment context, it has never attempted to summarize the exception.  The various attempts by lower federal courts to summarize what constitutes an exigent circumstance are quite similar to this court's statement in *Stevens*.  *See, e.g.*, *United States v. McConney*, 728 F2d 1195, 1199 (9th Cir), *cert den*, 469 US 824 (1984) (exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officer of other persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts").

11

simply serve as a synonym for "need" or "requirement," and, at most, refers broadly to an immediate or urgent need.[5] But, particularly when "exigency" modifies the term "circumstances" ("circumstances * * * of such exigency"), and appears in a portion of the statute that is concerned with whether the circumstances make it "unreasonable" to obtain a court order to acquire a certain kind of evidence, it is arguable, at the very least, that the legislature intended the term to convey the specialized legal concept associated with the warrant requirement and the constitutional prohibition against unreasonable searches and seizures. Although the state insists that that possibility is foreclosed by the legislature's failure to employ what the state deems to be the standard phraseology ("exigent circumstances") for referring to that concept, even a cursory examination of this court's constitutional cases shows that "exigency" often is used to refer to the widely understood exception to the warrant requirement. *See, e.g.*, *Stevens*, 311 Or at 130 ("The scope of the first warrantless search was properly limited to the exigency that justified it."); *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988) ("A search or seizure to obtain evidence of a crime is unconstitutional if no warrant authorized the search or seizure and there is no exigency that would obviate the need for a warrant."); *State v. Hawkins*, 255

---

[5] According to *Webster's Third New Int'l Dictionary* 796 (unabridged ed 2002), "exigency" means:

> "1: The quality or state of being exigent: PRESSURE, URGENCY * * * 2: such need or necessity as belongs to the occasion: DEMANDS, REQUIREMENTS."

"Exigent," the term referenced in the first definition, means "exacting or requiring immediate aid or action: PRESSING, CRITICAL." *Id.*

Or 39, 42, 463 P2d 858 (1970) ("There may be circumstances where an application for another warrant is impossible or impractical and, therefore, the exigencies justify such a search and seizure.").

Another aspect of the provision's wording supports defendant's contention that the legislature had in mind the well-known constitutional doctrine of exigent circumstances that obviate the need for a warrant. Law enforcement officers who wish to proceed without a court order under ORS 133.726(7)(b) must be able not only to point to "circumstances of such exigency that it would be unreasonable to obtain a court order," but also must have "*probable cause* to believe that [the person whose communication is to be intercepted] has committed, is engaged in committing or is about to commit" a felony. The phrase "probable cause" inescapably alludes to a specialized legal concept associated with the constitutional prohibition (in both the Oregon and United States constitutions) against unreasonable searches and seizures,[6] and its use in ORS 133.726(7)(b) appears to confirm that the entire provision, including the "exigency" wording, was intended as a reference to the familiar "probable cause plus exigent circumstances" exception to the warrant requirement. *See, e.g., State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006) (warrantless search permitted if police could show

---

[6]     Article I, section 9, of the Oregon Constitution protects against unreasonable searches and seizures and also provides that "no warrant shall issue but upon probable cause * * *." Similarly, the Fourth Amendment prohibits unreasonable searches and seizures and provides that "no Warrants shall issue, but upon probable cause * * *."

13

probable cause and exigent circumstances).

The state contends that, in light of the fact that ORS 133.726(7)(*a*) allows police to intercept communications in certain drug or prostitution investigations solely on a showing of probable cause, it is illogical to read ORS 133.726(7)(b) as codifying a constitutionally based "exigent circumstances" exception to the court order requirement:

> "It is unlikely that the legislature intended to allow the interception of future oral communications without any court order, and without any proof of exigency, yet also codify an 'exigent circumstances' exception with respect to the interception of future oral communications for other crimes under a theory that those communications are 'evidence' subject to destruction or dissipation."

But we see nothing illogical or unlikely about such a choice. The legislature may have attempted, in subsection (7)(b), to ensure that the use of electronic interception and recording devices by police generally remains within what it deemed to be a constitutional safe haven, but at the same time, decided (correctly or incorrectly) that the typical use of such devices in investigating certain types of drug and prostitution crimes did not present any significant constitutional issue, justifying a blanket exception from the court order requirement in such investigations. Whether or not such a line of thinking was or would have been constitutionally sound is not the issue: We are concerned here with what the legislature intended, and the existence of an exception for drug and prostitution investigations does not logically foreclose the possibility that it intended, in ORS 133.726(7)(b), to speak to a familiar constitutional paradigm, *i.e.*, exigent circumstances that obviate the necessity of obtaining a judicial order before proceeding with a search or seizure.

14

Although we are persuaded that the most likely meaning of "exigency" in ORS 133.726(7)(b) can be divined from text and context alone, we may also consider the provision's legislative history. *State v. Gaines*, 346 Or 160, 165-73, 206 P3d 1042 (2009) (in interpreting statute, even if court does not perceive an ambiguity in the statute's text and context, it may consider a statute's legislative history that is useful to the court's analysis). A full discussion of that history, which involved successive amendments to the statutes regarding police interception of communications over a period of years, is unnecessary here, but several relevant points emerge. First, it is notable that the first conceptual ancestor to the "exigency" wording in ORS 133.726(7)(b) employed the more standard constitutional phraseology. Specifically, a 1983 amendment to the "Interception of Communications" statutes introduced the less stringent requirement for an order permitting police interception of communications to which a law enforcement officer or an informant is a party, but then provided that such orders "shall not be necessary * * * if *exigent circumstances* make it unreasonable to obtain the order." Or Laws 1983, ch 824, § 1. Although that wording was changed to the present "circumstances of such exigency" wording in a later amendment, Or Laws 1989, ch 1078, § 1, the history of the adoption of that amendment suggests that the legislators understood the phrases to be interchangeable: Throughout the committee discussions of the amendment, legislators and advocates referred to the provision as an "exigent circumstances" provision. *See, e.g.*, Tape Recording, Senate Committee on Judiciary, SB 2252, June 5, 1989, Tape 218, Side B (statements of Senator Shoemaker, Committee Counsel Morris, and Dale Penn of the Oregon District Attorney's Association, all referring to "exigent circumstances").

15

The same pattern (of legislators referring to the provision in terms of "exigent circumstances") occurred in 2001, when the legislature expanded and reorganized ORS 133.726 and readopted the "circumstances of such exigency" wording. *See, e.g.*, Tape Recording, House Committee on Judiciary, SB 654, May 24, 2001, Tape 71, Side B (statement of Mark McDonnell that police may lawfully employ body wires when there are "*exigent circumstances* that ma[k]e it unreasonable to obtain an ex parte order"); Testimony, Senate Committee on Judiciary, SB 654, Mar 12, 2001, Exhibit K (statement of Erik Wasmann, Department of Justice, that the amendments would "re-enact the authority of law enforcement officers to use a body-wire without a court order in drug investigations or when the officer is investigating some other felony and there are *exigent circumstances*"); Tape Recording, Senate Committee on Judiciary, SB 654, Apr 16, 2001, Tape 97, Side B (statement of Committee Counsel Prins that the provision under consideration allows police to use a body wire without a court order if there is probable cause of a felony and "what is called *exigent circumstances*"). Thus, even if the state is correct that the present "circumstances of such exigency" wording is not as closely associated with the familiar constitutional doctrine as are the words "exigent circumstances," the legislators who adopted the wording do not appear to have recognized any difference.

Another significant point can be drawn from the legislative history of ORS 133.726(7)(b). As noted, in 2001, the legislature reorganized ORS 133.726 and made significant changes to subsection (7), where the exceptions to the *ex parte* order requirement were codified. In amending subsection (7), the legislature readopted the

16

"circumstances of such exigency" wording that appeared in the existing statute and added a requirement that the police have "probable cause" to believe that the person targeted "has committed, is engaged in committing or is about to commit" a felony. We already have indicated that the simple fact that the legislature chose to combine references to "probable cause" and "exigenc[ies]" that makes it "unreasonable" to obtain an order strongly suggests that it had constitutional search and seizure concepts in mind. __ Or at __ (slip op at 13-14). The history of the legislature's consideration of the 2001 changes confirms that point.

During the consideration of the 2001 amendments, legislators and advocates devoted much of the debate to the constitutionality of a proposal to expand a preexisting blanket exception from the judicial order requirement that applied to certain drug investigations to include certain prostitution investigations as well. The proposed blanket exception was included as a subsection of the same section of the bill that contained the "exigency" exception. During the debates, the concept of "exigent circumstances" was repeatedly raised, with one legislator even suggesting that, in the context of drug and prostitution investigations, he "might be inclined to say that exigent circumstances can be based on the safety of an officer" and an ACLU representative responding that police officers "cannot create their own exigency." Tape Recording, House Committee on Judiciary, SB 654, May 24, 2001, Tape 71, Side B (comments of Rep Robert Ackerman, ACLU representative David Fidanque). Although those discussions were specifically about the closely related blanket exception for interceptions related to drug and prostitution offenses, they show that the legislators had the

constitutional concept of "exigent circumstances" very much on their minds when they were considering the 2001 amendments that included the wording under consideration.

The state draws our attention to a suggestion made by one legislator, Representative Kathy Lowe, and her committee's failure to act on that suggestion. Lowe commented:

> "We have a great body of law that talks about probable cause and exigent circumstances and why don't we just incorporate that into the statute and say 'if you have probable cause and exigent circumstances, you may use a body wire, then you've got to justify after the fact and if it doesn't meet the smell test, you're out of there.' Meanwhile, you've gotten your body wire, and you can also carve out an exception to use a body wire strictly for officer safety but not usable otherwise."

Tape Recording, House Committee on Judiciary, SB 654, May 25, 2001, Tape 77, side A (statement of Rep Kathy Lowe). The state contends that Lowe was referring to the "circumstances * * * are of such exigency" wording of the bill under consideration when she suggested that the legislature adopt the "body of law that talks about probable cause and exigent circumstances," and that the committee's failure to amend the bill in response to that suggestion demonstrates that the legislature did not intend to adopt the constitutional "exigent circumstances" construct.

However, when considered in the context in which they were spoken, it is evident that Lowe's words were directed at the bill's proposal to continue the blanket exception from the *ex parte* order requirement for drug investigations and to add a similar blanket exception for prostitution investigations. Understood in that light, Lowe's comment appears to support *defendants*' contention that the legislature understood the "exigency" wording in the bill as incorporating the "body of law that talks about probable

18

cause and exigent circumstances."

We conclude that, in ORS 133.726(7)(b), the phrase "circumstances * * * of such exigency that it would be unreasonable to obtain a court order," refers to "exigent circumstances" in the specialized legal sense -- as it has been used by this court in discussing exceptions to the search warrant requirement under Article I, section 9, and by the federal courts in discussing exceptions to the warrant requirement under the Fourth Amendment. As noted, this court has summarized the concept in terms of circumstances that "require[] the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence," *Stevens*, 311 Or at 126, while the federal courts have similarly stated that exigent circumstances "are present when a reasonable person [would] believe that entry * * * was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Alaimalo*, 313 F3d 1188, 1192-93 (9th Cir 2002), *cert den*, 540 US 895 (2003). Although neither of those statements purports to catalog every kind of circumstance that would qualify as exigent, they limit the concept of exigent circumstances to those that, without swift action, likely would have immediate consequences to persons, property, or law enforcement operations.

IV. APPLICATION OF "EXIGENCY" EXCEPTION

We turn to the task of applying that meaning to the facts in this case. The question, specifically, is whether the police officers who arranged for the interception and recording of Maynard's hotel room conversation with defendants were excused from

19

obtaining an *ex parte* order as described in ORS 133.726 because there was some exigency that made it unreasonable to do so -- a circumstance requiring immediate or swift action to avert threatened injury to person or property, loss of evidence, escape of a suspect, or the like.

At the hearing on defendants' motion to suppress, the state's theory was that an exigency was created by concerns that defendants were disposing of the stolen property and by an asserted "threat" that defendants posed to Maynard. Bethers testimony reflected that theory. He testified about his understanding that defendants already had disposed of some of the stolen property and that they were "pressuring" Maynard to return a certain item of the stolen property to them. The state suggested, through Bethers' testimony, that, if the ordinary practices of the Salem Police Department were followed, the process of obtaining an *ex parte* order under ORS 133.726 would have taken four hours, and would have been so time consuming that it would have prevented the police from carrying out the "sting" operation within an appropriate time frame, *i.e.*, "as soon as possible."

In their cross-examination of Bethers and Abel, defendants brought out facts that, in defendants' view, belied the existence of an exigency: that Abel and Bethers were considering some kind of audio or video "sting" operation, albeit in "broad terms," on Friday night; that Abel believed that he had probable cause to arrest defendants on Friday night; that Bethers had not immediately met with Maynard after receiving her 11:00 a.m. phone call; that, at the time Bethers decided to proceed with the sting operation without a court order, Maynard was safe from any threat that defendants might

20

pose; and that Bethers controlled the timing of the sting operation and could have applied for a court order on Saturday afternoon or evening and then held off on the operation until a court order issued -- during the night or even the next day. Although Bethers admitted the last point, he insisted that (1) a nighttime operation would have been unsuccessful because defendants likely would not have been willing to be out on the streets in the middle of the night; and (2) leaving the operation until the next day was undesirable because "the idea was to progress with the investigation as soon as possible, both to * * * recover the stolen property and get the suspects in custody in order to stop the threat that we had to Ms. Maynard."

The last admission by Bethers is, in our view, crucial. Even if we accept as true all of the other factual underpinnings of the state's position -- that, until late Saturday afternoon, the police lacked probable cause and a clear plan of action; that, until that time, they had no reason to apply for an *ex parte* order and no ability to obtain one; and that, if they *had* applied for an order on Saturday evening, it would not have issued until some time in the middle of the night -- the fact remains that the only negative consequences of waiting for a court order that Bethers was able to identify was that the investigation would not "progress * * * as soon as possible" and that, as a result, defendants might be able to continue to sell the stolen property and "pressure" Maynard for another day. But those potential consequences of waiting for a court order do not amount an "exigency" within the meaning of ORS 133.726(7)(b). As discussed above, an "exigency" for purposes of that statute must involve something akin to the kind of circumstances that would qualify as "exigent circumstances" under Article I, section 9, or

21

the Fourth Amendment -- circumstances that require swift action to prevent harm to persons or property, escape of a suspect, destruction of evidence, or the like. The term does not encompass circumstances like those Bethers described -- defendants' continuing involvement in undesirable activities that the police reasonably would wish to stop "as soon as possible," but that do not constitute an immediate threat to persons, property, or law enforcement efforts.

Furthermore, even if we were to accept Bethers' preference for winding up the investigation "that night" or "as soon as possible" as a potential "exigency," the evidence presented in the suppression hearing shows that Bethers reasonably *could* have obtained the required court order within the preferred time frame. According to Bethers own testimony, the police had the necessary probable cause to obtain a court order under ORS 133.726 by 5:30 p.m. on Saturday, when Maynard met with Bethers and turned over the laptop that was in her possession to him.[7] It would appear, moreover, that Bethers had a definite plan for recording a conversation between defendants and Maynard by 6:30 p.m. on Saturday evening at the latest, and probably before that: By 6:45 p.m., other police officers were receiving calls to report to the police station to assist in the operation that Bethers had planned. Had Bethers applied for a court order under ORS 133.726 at 6:30 p.m., he could have proceeded with his preparations with the expectation that he

---

[7]     The police arguably had the required probable cause much earlier, when Maynard told Abel that defendants had carried out the burglary and described stolen items in terms that, according to Abel, "exactly" matched the list of stolen items that Aaron's had furnished to the police.

22

would have an order in hand by 10:30 p.m. (using Bethers's own four-hour estimate for obtaining such an order). Although it is true that Bethers was reluctant to postpone the operation any longer than he did because he believed that defendants would not be likely to want to be out on the street at midnight, 10:30 p.m. is not midnight (and was only about an hour later than the time that defendants actually arrived at Maynard's hotel room). All in all, it would seem that Bethers reasonably could have obtained a court order within the time frame that the state contends for, *i.e.*, "that night" or "as soon as possible."

We conclude that the circumstances at the time that Bethers decided to go forward with the monitoring operation were not, in the words of ORS 133.726(7)(b), "of such exigency that it would be unreasonable to obtain a court order." It follows that the recording of defendants' conversation with Maynard was obtained in violation of ORS 133.726 and ORS 165.540(1)(c), and was inadmissible in the criminal proceedings against defendants under ORS 41.910(1). The trial court erred in denying defendants' motion to suppress the recording and transcript of the conversation under ORS 133.736(1).

Having established that the trial court erred, we must determine whether the trial court's judgment should be affirmed nevertheless because the error was harmless. Or Const, Art VII (Amended), § 3 (if Supreme Court is of the opinion that the judgment "was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial"). That determination involves a single question: "Is there little likelihood that the particular error affected the verdict?"

23

*State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). We do not weigh the evidence and seek to determine whether, disregarding the error, the defendant nevertheless probably would have been found guilty. *Id.*

The state contends that admission of the recorded hotel conversation was harmless under that standard. It argues that the recording contains nothing that *directly* undermines defendants' theory of the case (that defendants were not involved in the burglary). The state acknowledges that the recording might serve to generally corroborate Maynard's testimony against defendants, but it argues that its value for that purpose was relatively low because Maynard's testimony was corroborated by other evidence.[8]

We disagree with the state's assessment of the conversation. As we already have observed, the intercepted conversation generally was about Maynard's boyfriend, Alcaraz, and defendants' belief that he had taken a computer monitor that belonged to

[8] Neither party distinguishes between the harmless error analysis that would apply to the different crimes of which defendants were convicted. A person commits burglary if the person "enters or remains unlawfully in a building with intent to commit a crime therein." ORS 164.215(1). A person commits theft if the person, "with intent to deprive another of property or to appropriate property to the person or a third person," the person "[t]akes, appropriates, obtains or withholds such property from an owner * * *." ORS 164.015(1). Evidence, including fingerprints and the testimony of Hicks, supports the state's contention that defendants "obtained" or "withheld" the stolen goods, and the intercepted conversation was less critical to that charge. However, only Maynard's testimony -- which was corroborated by the intercepted conversation -- supports the unlawful "entering" element of the burglary charge. The state, however, makes no separate argument that the admission of the intercepted conversation was harmless error as to the *theft* charge, even if it was not harmless as to the burglary charge, and we decline to consider that issue *sua sponte*.

24

them, and that, by inference, defendants had stolen. First, when defendants and Maynard referred to the monitor -- and to a TV, a "tower," "all that shit," "stolen goods," and "merchandise from that store" that apparently at one point were at Maynard's apartment -- it is possible to infer that they were talking about items that someone had stolen from Aaron's. When defendant Miskell spoke of "my monitor," and defendant Sinibaldi spoke of Alcaraz "stealing" the monitor, it also is possible to infer that they felt that they had a right to the items that was superior to Maynard's and Alcaraz's. Finally, defendants made a number of statements that could suggest that defendants' superior rights derived from the fact that they were the primary actors in the burglary and that Maynard and Alcaraz merely assisted. After voicing his suspicion about Alcaraz taking one of the computers, defendant Miskell stated: "[H]ey, you don't rip me off, especially when I hook you up with what we do. We hooked you guys up, you know what I mean." Later, Miskell suggested that he would have given Alcaraz some money if he had asked because "you know what I'm saying, you helped me out, here, I'll return the favor." In short, while it is true that the conversation did not involve any *direct* discussion of the burglary or defendants' role in it, it contains statements that, taken together, would support an inference that defendants not only had been involved in the burglary, but had been the primary actors in it.

Moreover, the value of the recorded conversation as corroboration of Maynard's testimony is significantly greater than the state perceives. Maynard had been forced to acknowledge in her testimony that she had offered her assistance to the police under circumstances that suggested that her primary interest was in currying favor, that

25

she initially had lied to the police about her involvement in the burglary, and that, in fact, she had been an accomplice in the burglary. In view of Maynard's admissions, the jury was entitled to doubt both her motives and her credibility, and to be particularly skeptical of the parts of her story that minimized her own involvement in the burglary *vis-à-vis* that of defendants.

Although the state presented other evidence that corroborated aspects of Maynard's story (such as Hicks's friend's testimony that defendant and the stolen goods were in Maynard's apartment the night after the burglary, and a police officer's testimony that certain of the stolen items were recovered from the person who, according to Maynard, had purchased them), the recorded conversation was the only evidence presented that could be viewed as corroborating Maynard's assertion that defendants were the primary actors in the burglary.[9] To the extent that Maynard's obvious motive to deflect attention from her own involvement in the burglary might cause the jury to doubt that specific contention, the recorded conversation might serve as an antidote to those doubts. And the antidote, *i.e.*, the recorded conversation, would be particularly damaging to defendants because it contained their own vivid and unguarded statements (as opposed

[9]     As noted, the state also introduced a security video from Aaron's, and it argues that the video's poor quality "did not preclude the jury from considering the video as evidence in determining whether defendants * * * were actually depicted." The video shows two, or perhaps three, men stealing various products from Aaron's. While the video, combined with other evidence, might be sufficient evidence to sustain a guilty verdict, the harmless error test is not whether the evidence that remains after excluding the improperly admitted evidence is sufficient to support the verdict, but whether "the particular error affected the verdict." *Davis*, 336 Or at 32.

26

to the more detached statements of a third party). The recorded conversation thus was not merely cumulative of other evidence (except the testimony of Maynard, an accomplice whom the jury had reason to disbelieve) but it also went to a key element of the state's case, *i.e.*, defendants' responsibility for the Aaron's burglary, as opposed to some lesser involvement with the stolen property.[10]

For the foregoing reasons, we cannot conclude that there was "little likelihood" that the admission of the recorded conversation affected the verdicts in defendants' cases. It follows that the error in admitting the recording was not harmless, and that the judgments entered on the verdicts should be reversed.

The decision of the Court of Appeals and the judgment of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

---

[10] The jury was instructed that Maynard could, depending on the jury's assessment of the facts, be an accomplice of defendants in the crimes charged. It was further instructed that, if it determined that Maynard was an accomplice, the jury "should view [her] testimony with distrust" and that her testimony, standing alone, would not be "sufficient to support a conviction," but would have to be corroborated by other evidence "that tends to connect the defendant with the crime." Thus, as noted, the intercepted communication was significant because it had defendants' own voices implicating themselves in the burglary and also because it tended to corroborate Maynard's testimony as to their role.