Argued and submitted January 5; decision of Court of Appeals reversed, order of circuit court affirmed December 30, 2021

STATE OF OREGON,
*Respondent on Review,*

*v.*

CHARLES STEVEN McCARTHY,
*Petitioner on Review.*

(CC 16CR75546) (CA A165026) (SC S067608)

501 P3d 478

Law enforcement officers initiated a traffic stop of a vehicle that defendant was driving. During the stop, officers developed probable cause to believe that the vehicle contained contraband. After arresting defendant, officers conducted a warrantless search of the vehicle, relying on the "automobile exception" to the warrant requirement that this court created in *State v. Brown*, 301 Or 268, 721 P2d 1357 (1986). Defendant moved to suppress evidence discovered during the search, and the trial court granted the motion on the ground that the state had failed to prove that exigent circumstances existed at the time of the search. The Court of Appeals reversed, holding that, under *Brown*, exigent circumstances are presumed to exist if a vehicle was mobile when it was stopped by the police, regardless of whether there is an actual exigency after that point. *Held*: In order to justify a warrantless seizure or search of a vehicle based on exigent circumstances, the state must prove that exigent circumstances actually existed at the time of the seizure or the search; the contrary holding of *Brown* is overruled.

The decision of the Court of Appeals is reversed. The order of the circuit court is affirmed.

On review from the Court of Appeals.*

Zachary J. Stern, Ferder, Casebeer, French and Stern, LLP, Salem, argued the cause and filed the briefs for petitioner on review.

Christopher A. Perdue, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Rosalind M. Lee, Eugene, filed the brief for *amici curiae* Oregon Criminal Defense Lawyers Association and Oregon Justice Resource Center.

_____

* On appeal from Marion County Circuit Court, Lindsay Partridge, Judge. 302 Or App 82, 459 P3d 890 (2020).

Before Walters, Chief Justice, Nakamoto, Flynn, Duncan, Nelson, and Garrett, Justices, and Landau, Senior Judge, Justice pro tempore.**

DUNCAN, J.

The decision of the Court of Appeals is reversed. The order of the circuit court is affirmed.

_____

** Balmer, J., did not participate in the consideration or decision of this case.

**DUNCAN, J.**

In this criminal case, defendant moved to suppress evidence that law enforcement officers obtained during a warrantless search of a truck. Defendant had been driving the truck when officers stopped it for a traffic violation. During the stop, the officers developed probable cause to believe that the truck contained contraband. Although the stop occurred on a weekday afternoon near the county courthouse and the officers had mobile phones and a computer, the officers did not attempt to contact a magistrate—either in person or by phone or computer—to obtain a warrant to search the truck. Instead, they searched it without a warrant. At the time of the search, the truck was lawfully parked in a parking lot and defendant had been arrested.

In his motion to suppress, defendant argued that the warrantless search of the truck violated Article I, section 9, of the Oregon Constitution, which prohibits unreasonable searches and seizures.[1] Under Article I, section 9, searches and seizures must be conducted pursuant to a warrant or one of the few specifically established and limited exceptions to the warrant requirement. *State v. Bliss*, 363 Or 426, 430, 423 P3d 53 (2018). Searches and seizures are distinct events requiring separate justifications. *State v. Tanner*, 304 Or 312, 316, 745 P2d 757 (1987).

In response to defendant's motion to suppress, the state argued that the warrantless search of the truck was justified under the "automobile exception" to the warrant requirement. This court created the automobile exception in *State v. Brown*, 301 Or 268, 278, 721 P2d 1357 (1986), in which it held that an officer may conduct a warrantless search of a car if "(1) the car was mobile at the time it was stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence."

The trial court rejected the state's argument, reasoning that the automobile exception is premised on the

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

existence of exigent circumstances, and the state had failed to prove that exigent circumstances existed at the time the officers searched the truck.

The state appealed, and the Court of Appeals reversed on the ground that, under *Brown*, exigent circumstances are presumed to exist if a vehicle was mobile when it was stopped by the police, regardless of whether there is an actual exigency after that point. *State v. McCarthy*, 302 Or App 82, 92, 459 P3d 890 (2020). Applying *Brown*'s "'*per se* exigency rule,'" the Court of Appeals held that all that the state was required to show was that the truck was mobile at the time it was stopped by the officers and that the officers had probable cause to search it. *Id.* at 90-91 (quoting *Brown*, 301 Or at 277). Therefore, the court concluded that, under *Brown*, the state was not required to demonstrate that there had been an actual exigency at the time of the search. *Id.* at 92.

On defendant's petition, we allowed review. For the reasons we explain below, we overrule *Brown*'s *per se* exigency rule and hold that, in order to justify a warrantless seizure or search of a vehicle based on exigent circumstances, the state must prove that exigent circumstances actually existed at the time of the seizure or search. Because the state did not do so here, we conclude that the trial court correctly granted defendant's motion to suppress.

## I.  BACKGROUND

On the afternoon of Monday, November 28, 2016, Salem Police Detectives Garland and Bidiman were surveilling a residence from an undercover police car. They saw a truck occupied by defendant and two passengers parked in front of the residence.

When defendant began driving away from the residence, Garland and Bidiman decided to follow him. As the truck drove by the officers, Bidiman recognized defendant as the driver. Garland was familiar with defendant from prior drug investigations in May and June of 2016. During the June 2016 investigation, defendant reportedly had agreed to sell heroin to an informant working with another officer, Detective Carney, but the sale never occurred. As Garland drove behind defendant, he saw the truck drift into a bike

lane. Garland initiated a traffic stop at 1:31 p.m. as defendant turned into a parking lot. Defendant legally parked the truck in a parking stall, and Garland positioned the police car behind it. The stop occurred approximately one mile east of the Marion County Circuit Court building in downtown Salem.

The officers approached the truck and Garland asked defendant for his driver's license, registration, and proof of insurance. Defendant stated that his license was suspended and that he was not the registered owner of the truck. Defendant provided a copy of the truck's registration but said that he did not know where the truck's insurance card was. Garland asked defendant to look around the cab of the truck for proof of insurance while he returned to the police car to check the status of defendant's license.

After using the police car's onboard computer to confirm that defendant's license was suspended, Garland returned to the truck and asked defendant if he had found proof of insurance. Defendant said that he had not, and Garland then allowed defendant to make a phone call to the truck's registered owner to determine whether the truck was insured. Meanwhile, Garland began processing citations for failure to maintain a lane and driving while suspended. After calling the truck's registered owner, defendant told Garland that the truck was insured through State Farm, at which point Garland asked Bidiman to call State Farm to verify the truck's insurance. While Bidiman was on the phone with State Farm, a third officer, Detective Smith, arrived on the scene. At that point, Garland tried to contact Detective Carney to ask whether there was a lawful basis to arrest defendant in connection with the June 2016 drug investigation.

During their interactions with defendant, the officers noticed that defendant and his passengers seemed nervous. The officers also observed dark brown stains on the hands of defendant and one passenger, which the officers believed were consistent with handling heroin.

Garland's attempts to contact Carney were unsuccessful, but Smith was able to reach Carney on Carney's personal cellphone. Carney told Smith that there was

probable cause to arrest defendant for conspiracy to deliver heroin based on the June 2016 investigation. Smith then approached the truck and asked defendant about the presence of controlled substances, which defendant denied. Smith also requested consent to search the truck, but defendant refused.

Instead of arresting defendant immediately, at 1:39 p.m. Garland and Smith contacted Oregon State Police Trooper Freitag, a K-9 handler, and asked him to come to the scene with a drug detection dog. At the time the officers called Freitag, defendant had still not been issued any citations. Freitag arrived at 1:57 p.m., and the officers asked defendant and his passengers to vacate the truck. Defendant was arrested for conspiracy to deliver heroin based on the June 2016 drug investigation. Freitag then deployed his drug detection dog, who alerted to the presence of a controlled substance near the front passenger door of the truck, at which point defendant's passengers were both arrested. Eventually, the truck's registered owner arrived at the scene, but he was detained on an outstanding warrant and, therefore, was unable to drive the truck away.

Because the truck was legally parked and was not a traffic hazard, Salem Police Department policy did not authorize the officers to impound it. During his testimony before the trial court, Smith estimated that obtaining a warrant to search the truck would have taken "four hours, if not longer." Garland testified that, instead of applying for a warrant, the officers relied on the automobile exception to the warrant requirement to search the truck. Garland also explained that he could have sought a warrant but had chosen not to do so because he believed the unoccupied truck was still "mobile."

The search of the truck uncovered heroin, a scale, and drug paraphernalia. Based on that evidence, defendant was charged with possession and delivery of heroin.

Defendant moved to suppress various items seized after his arrest, including the items discovered during the search of the truck. After an evidentiary hearing, the trial court issued a letter opinion in April 2017, making the following findings regarding when the truck was mobile and

when the officers developed probable cause to believe it contained contraband:

> "5.    Immediately prior to the traffic stop the vehicle was mobile. During the traffic stop the vehicle was lawfully parked in a parking lot accessible to the public.
>
> "6.    Once defendant was in custody and the vehicle was at least temporarily immobile[,] [o]fficers contacted the registered owner and determined that he had a warrant for his arrest and therefore he was unable to move the vehicle.
>
> "7.    Probable cause existed to believe the vehicle would contain contraband due to the following:
>
> "a.    Officer Garland observed defendant leaving from a residence that he knew to be a known drug house;
>
> "b.    Police officers knew there was probable cause to arrest defendant for a drug offense from [June] 2016;
>
> "c.    During the traffic stop officers observed stains on defendant's shirt and fingers consistent with tar heroin;
>
> "d.    Defendant appeared nervous and shaky during his contact with police;
>
> "e.    A drug detection dog alerted to the presence of controlled substances during the traffic stop."

The trial court went on to explain that a warrantless search under the automobile exception is valid under *Brown* if (1) the automobile is mobile at the time it is stopped by police and (2) probable cause exists for the search. (Citing *Brown*, 301 Or at 274.) The trial court further explained that "the mobility of the vehicle and the existence of probable cause to believe defendant has committed a crime must exist at the same time for the exception to apply." (Citing *State v. Kurokawa-Lasciak*, 351 Or 179, 263 P3d 336 (2011) (*Kurokawa-Lasciak II*); *State v. Pirtle*, 255 Or App 195, 296 P3d 625 (2013); and *State v. Groom*, 249 Or App 118, 274 P3d 876 (2012).)

Applying those rules, the trial court held that the automobile exception did not apply because the truck was not mobile and was unoccupied at the time the officers developed probable cause that it contained contraband. The trial court also held that the automobile exception did not apply

because there were no exigent circumstances at the time of the search:

> "The state cannot justify the search of the vehicle through the automobile exception. The state bears the burden to establish an exception to the warrant requirement. Under the circumstances in this case, it is clear that the police lacked any reason to believe an imminent threat existed that someone would move the vehicle prior to obtaining a warrant.

> "Officer Garland testified that he was concerned about how long it would take to get a warrant. However, he was completely unaware of the option of seeking a telephonic warrant. In fact, he responded he was not trained in the area of obtaining a telephonic warrant and stated, 'I don't believe we can do that.' Furthermore, he did not explain adequately why the police could not observe the vehicle during the period of time needed to obtain a warrant and only seize the vehicle if there was an attempt to move the vehicle.

> "* * * [T]he automobile exception is based upon the concern that a vehicle containing evidence of a crime will be moved and the state will lose the ability to seize such evidence. However, the exception requires that the state demonstrate at least a realistic likelihood that someone will move the vehicle prior to the police obtaining judicial authorization to search the automobile. In this case the state only presented a general theory that the vehicle was operable. However, neither the registered owner nor defendant could move the vehicle as both were in custody. The vehicle was unoccupied and otherwise was parked in a manner that did not create a safety hazard. The state presented no other evidence that the vehicle could be moved. Accordingly, the warrantless search of the vehicle is not justified through the automobile exception."

The state filed a motion for reconsideration. At the state's request, the trial court held a second evidentiary hearing with additional argument. During the hearing, Smith testified that applying for a warrant that is supported by a written affidavit could "[e]asily [take] four or more hours." Smith also testified about the use of telephonic warrants in Marion County, stating: "My understanding, Marion County Circuit Court system does not do telephonic warrants. And nor have I ever had any training on how to

do one, how to apply for one, and what the policies and procedures would be if that ability was there." Deputy District Attorney Suver also testified about the use of telephonic warrants in Marion County. She explained that the Marion County District Attorney's Office trained officers with the instruction that "we don't do telephonic search warrants in Marion County." She further testified that every search warrant affidavit is reviewed by the Marion County District Attorney's Office prior to being submitted for judicial approval, and that the use of telephonic warrants would "cut out that review process."

At the end of the hearing, the trial judge addressed the issue of telephonic warrants, explaining that he could not understand why the officers and district attorney's office did not utilize them in general or why they could not have attempted to get one in this case:

> "So, I'm a little frustrated that we keep coming back to this issue that, well, the bench likes it done this certain way, so we are not going to do telephonic warrants. Well, it's the law. And it seems striking to me that 1:30 on a Monday afternoon, with 14 judges in Marion County and four judicial officers in addition to that, that there couldn't be somebody that gets a call from an officer, swears the officer in, and says, 'Tell me what you've got.' *** Not much different than the testimony that I took from four officers in less than an hour when we did the original [hearing]. And the judge makes a decision."

In May 2017, the trial court issued a second letter opinion in which it (1) found that the state had failed to prove that there was a risk that the truck would have been moved in the time it would have taken the officers to obtain a warrant, (2) rejected the claim that the county's circuit court had a policy against telephonic warrants, and (3) concluded that the warrantless search of the truck violated Article I, section 9:

> "The court must give more than lip service to the axiom that warrantless searches are *per se* unreasonable under [Article] I, section 9, and the Fourth Amendment. The rationale for the automobile exception is that evidence of crime may be lost as the automobile drives away from the traffic stop. It takes into account the reality that the evidence is

mobile. However, that rationale does not exist under the facts of this case.

"The state presented no evidence that anyone would move the automobile from the scene while the police sought judicial authorization for the search. At the supplemental hearing, the state went to great lengths to discuss the time consuming process to obtain a written search warrant. ＊＊＊

"However, the state fails to prove how inconvenient it would have been to obtain judicial authorization in this case. The arrest occurred on a regular working day in the early afternoon. The state fails to address why one of the officers could not avail themselves of an existing process under Oregon law, make a call on a cellphone to the court-house, lay out the facts under oath to a judicial officer and have the judicial officer determine if probable cause existed. The answer seems to be that 'we just don't do it that way.'

"Additionally, the state seemed to argue that there is a 'policy' from the Marion County Circuit Court bench that judges will not accept telephonic warrant requests. The court rejects that such a policy exists although it acknowledges the bench has had discussions about some of the practical problems associated with telephonic warrants.

"In the final analysis the state must show that conducting a warrantless search is reasonable. Under the facts in this case no showing has been made. The holding in *Brown* has never been universally accepted by all judges. At the time of the *Brown* decision, Justice Linde pointed out how the statute and technology back in 1986 called into question the bright line test in *Brown*. No one would dispute that the technology today is even much more advanced 30 years later.

"Today, everyone has a cellphone. ＊＊＊ It is unreasonable under the circumstances *in this case* that no one even considered the idea of calling a judge from the site of the traffic stop to seek judicial authorization. Accordingly, this court cannot find that the state has proven that the warrantless search of the automobile was reasonable."

(Emphasis in original.) Accordingly, the trial court granted defendant's motion to suppress the evidence discovered as a result of the warrantless search of the truck.[2]

---

[2] Defendant's motion also sought the suppression of evidence obtained during a search of defendant's person. The trial court denied that part of the motion, and that ruling is not at issue on appeal.

The state appealed, asserting that the trial court erred by granting defendant's motion to suppress. It argued that "the trial court added a third requirement [for the automobile exception to apply] not found in case law: that the state show that it could not have obtained a warrant before someone tried to move the truck." In response, defendant argued that, as a result of this court's decision in *State v. Andersen*, 361 Or 187, 390 P3d 992 (2017) (*Andersen II*), the automobile exception is no longer a *per se* exception and the state had failed to meet its burden of proving that an actual exigency existed at the time of the search. Defendant based that argument on the following statement in *Andersen II*:

> "We do not foreclose the possibility that *Brown* held out—that changes in technology and communication could result in warrants being drafted, submitted to a magistrate, and reviewed with sufficient speed that the automobile exception may no longer be justified in all cases. Nor do we foreclose a showing in an individual case that a warrant could have been drafted and obtained with sufficient speed to obviate the exigency that underlies the automobile exception."

*Id.* at 200-01.

The Court of Appeals determined that, in making that statement, this court "cast some doubt" on whether the automobile exception continued to be a *per se* exception because the statement "appear[ed] to cast the theoretical exigency that underlies the automobile exception as a rebuttable presumption." *McCarthy*, 302 Or App at 89. But the court further determined that this court, in its subsequent decision in *Bliss*, "appear[ed] to have retreated from that view, instead reiterating that the automobile exception exists 'to provide law enforcement with "simple guidelines" and a "*per se*" rule for all highway stops, rather than a "complex set of rules dependent on particular facts regarding the time, location and manner" of the stop.'" *McCarthy*, 302 Or App at 90 (quoting *Bliss*, 363 Or at 434 (quoting *Brown*, 301 Or at 277)). Therefore, the Court of Appeals concluded that,

> "whatever *Andersen* [*II*] contemplated by a 'showing in an individual case that a warrant could have been drafted,' the possibility of such a showing does not undermine the presumptively *per se* nature of the automobile exception.

And, in turn, such a possibility does not create any extra burden upon the state to avail itself of the exception."

*Id*. (quoting *Andersen II*, 361 Or at 201). With that understanding of the state of the law, the Court of Appeals held that the automobile exception, as articulated in *Brown*, applied to the search of the truck that defendant had been driving because the truck was "'mobile at the time it [was] stopped by police'" and "'probable cause exist[ed] for the search.'" *Id.* at 91 (quoting *Brown*, 301 Or at 274 (brackets in *McCarthy*)). Accordingly, the court reversed and remanded the case to the trial court. *Id.* at 92.

Defendant petitioned for review, which we allowed to address the status of the automobile exception. On review, defendant urges us to overrule *Brown*'s *per se* rule and to hold that, in order for a warrantless seizure or search of a vehicle to be justified by exigent circumstances, there must be an actual exigency at the time of the seizure or search. The state, on the other hand, urges us to retain *Brown*'s *per se* rule, which allows for warrantless seizures and searches of vehicles even when there is no actual exigency. For the reasons we explain below, we overrule *Brown*'s *per se* rule and hold that, when the state seeks to justify a warrantless seizure or search of a vehicle based on exigent circumstances, the state must prove that exigent circumstances actually existed at the time of the seizure or search.

## II.  DISCUSSION

To address the parties' arguments, we begin, in section A below, with a discussion of Article I, section 9. Then, in section B, we discuss the doctrine of *stare decisis* and identify considerations relevant to whether we should adhere to *Brown*'s *per se* exigency exception. In sections C, D, and E, we explain why those considerations support revisiting *Brown*'s *per se* exception and overruling it. Based on that explanation, in section F, we hold that, to justify a warrantless seizure or search of a vehicle, the state must show that exigent circumstances actually existed at the time of the seizure or search. Finally, in section G, we conclude that the trial court in this case correctly ruled that the state had failed to make that showing, and we affirm its suppression of

the evidence obtained during the warrantless search of the truck.

## A.   *Article I, Section 9*

The starting point of our analysis is Article I, section 9, which guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Article I, section 9, protects both possessory and privacy interests. *State v. Barnthouse*, 360 Or 403, 413, 380 P3d 952 (2016). For the purposes of Article I, section 9, a seizure of property occurs when there is a significant interference with a person's possessory interests, and a search of property occurs when a person's privacy interests are invaded. *Id.*

Generally, to comply with Article I, section 9, a seizure or search must be supported by both probable cause and a warrant. *Bliss*, 363 Or at 430. In this case, defendant does not dispute that the officers had probable cause to search the truck; the issue is whether they needed a warrant.

"The constitution requires a warrant so that a disinterested branch of government—the judicial branch—and not the branch that conducts the search—the executive branch—makes the decision as to whether there is probable cause to search." *Kurokawa-Lasciak II*, 351 Or at 186. As this court has explained,

> "[t]he time to make the judicial determination whether there is probable cause for a search or a seizure, if time permits, is before the individual's privacy is invaded. A later adjudication upon a motion to suppress evidence, although necessary, does not undo the invasion, does not help persons who are cleared and never prosecuted, and colors the perception of 'probable cause' by what the search in fact revealed."

*State v. Lowry*, 295 Or 337, 346-47, 667 P2d 996 (1983), *overruled on other grounds by State v. Owens*, 302 Or 196, 729 P2d 524 (1986).

Under Article I, section 9, warrantless seizures and searches "are *per se* unreasonable unless they fall within one of the few specifically established and limited exceptions to the warrant requirement." *Bliss*, 363 Or at 430. The

scope of a warrant exception "is limited by the purposes for that exception." *State v. Fulmer*, 366 Or 224, 236, 460 P3d 486 (2020).

One exception to the warrant requirement is the "exigent circumstances" exception. Under that exception, police may conduct a warrantless seizure or search if they have probable cause and exigent circumstances exist. *State v. Ritz*, 361 Or 781, 791, 399 P3d 421 (2017). Exigent circumstances are circumstances "where prompt responsive action by police officers is demanded." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). In the search and seizure context, exigent circumstances are emergency situations "that require[] the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991); *accord State v. Miskell/Sinibaldi*, 351 Or 680, 696, 277 P3d 522 (2012) (stating that exigent circumstances are circumstances that, "without swift action, likely would have immediate consequences to persons, property, or law enforcement operations").

Exigent circumstances justifying a warrantless search "include situations where the delay caused by obtaining a warrant would likely lead to the loss of evidence." *Ritz*, 361 Or at 790. The exigency must be an actual exigency, not merely a theoretical one. *See, e.g.*, *State v. Peller*, 287 Or 255, 264, 598 P2d 684 (1979) (holding that "the mere possibility that defendant could make a break if he were so inclined" did not give rise to exigent circumstances when "there [was] no indication that he [was], in fact, so inclined"); *State v. Matsen/Wilson*, 287 Or 581, 587, 601 P2d 784 (1979) ("The fact that drugs are usually of a destructible nature, and the fact that suspects are likely to run out the back door when police enter the front door does not *ipso facto* create exigent circumstances.").

Generally, whether exigent circumstances exist is determined on a case-by-case basis. *Andersen II*, 361 Or at 202 (Walters, J., concurring) (collecting cases). That means law enforcement officers in the field must make their own assessments regarding whether circumstances justify

proceeding without a warrant. If later challenged through a motion to suppress, those assessments are reviewed by a court, and the state bears the burden of proving that the circumstances were actually exigent.

This court announced the "Oregon automobile exception" in *Brown* in 1986. 301 Or at 273-74. The automobile exception is a "subset of the exigent circumstances exception." *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006) (*Meharry II*). It is based on the idea that the mobility of vehicles creates exigent circumstances. *Brown*, 301 Or at 275-76. As mentioned, defendant asks us to overrule *Brown*'s *per se* exigency exception, whereas the state asks us to adhere to it. The parties' competing arguments implicate the doctrine of *stare decisis*.

B.   *The Doctrine of* Stare Decisis

Under the doctrine of *stare decisis*, this court assumes that its fully considered prior cases are correctly decided. *State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005). The idea underlying the doctrine is that adherence to precedent leads to stability in the law, which helps ensure predictability, efficiency, and fairness. *Farmers Ins. Co. v. Mowry*, 350 Or 686, 693, 261 P3d 1 (2011). Stability is important to "the consistent administration of justice and the legitimacy of this court's decisions." *Horton v. OHSU*, 359 Or 168, 256, 376 P3d 998 (2016) (Landau, J., concurring).[3]

This court has "emphasized the 'undeniable importance of stability in legal rules and decisions.'" *Farmers Ins. Co.*, 350 Or at 693 (quoting *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 53, 11 P3d 228 (2000)). At the same time, however, it has recognized "'the need *** to correct past errors.'" *Id.* (quoting *Stranahan*, 331 Or at 53). That is because "[c]orrectness is also important to the administration of

---

[3] *See also Farmers Ins. Co.*, 350 Or at 698 ("Stability and predictability are important values in the law; individuals and institutions act in reliance on this court's decisions, and to frustrate reasonable expectations based on prior decisions creates the potential for uncertainty and unfairness. Moreover, lower courts depend on consistency in this court's decisions in deciding the myriad cases that come before them."); *Couey v. Atkins*, 357 Or 460, 485, 355 P3d 866 (2015) ("*Stare decisis* does not permit this court to revisit a prior decision merely because the court's current members may hold a different view than its predecessors about a particular issue.").

justice and this court's legitimacy." *Horton*, 359 Or at 256 (Landau, J., concurring). If an earlier decision is not well reasoned or conflicts with other decisions, it can be difficult to apply and can result in confusion and uncertainty. *Id.* at 282 (stating that adherence to erroneous and conflicting decisions "produces its own threats to stability and predictability—the very virtues that *stare decisis* is supposed to promote"). Consequently, this court is willing to reconsider an earlier decision when it appears that the decision was incorrect, especially if, in making the decision, the court did not apply its usual interpretative methodology or was not presented with an important argument. *Farmers Ins. Co.*, 350 Or at 698. This court is also willing to reconsider an earlier decision when it conflicts with other decisions. *Couey*, 357 Or at 486. And this court is willing to reconsider an earlier decision when there have been subsequent legal or factual changes that seriously undermine the reasoning or result of the decision. *Farmers Ins. Co.*, 350 Or at 698. Thus, *stare decisis* is "not absolute." *Couey v. Atkins*, 357 Or 460, 485, 355 P3d 866 (2015). It is a "prudential doctrine that is defined by the competing needs for stability and flexibility in Oregon law." *Farmers Ins. Co.*, 350 Or at 697-98.

This case involves a question of state constitutional law, and, in cases involving such questions, "the value of stability that is served by adhering to precedent may be outweighed by the need to correct past errors" because this court "'is the body with the ultimate responsibility for construing our constitution, and, if we err, no other reviewing body can remedy that error.'" *Couey*, 357 Or at 485 (quoting *Stranahan*, 331 Or at 53).

"The answer to the question whether a case should be overruled cannot be reduced to the mechanical application of a formula but requires instead an exercise of judgment that takes all appropriate factors into consideration." *Horton*, 359 Or at 187. There is no fixed list of factors; the circumstances in which such determinations are made are "simply too varied." *Farmers Ins. Co.*, 350 Or at 693 n 3; *accord Couey*, 357 Or at 485 ("Precisely what constitutes an 'error' sufficient to warrant reconsideration of a constitutional precedent cannot be reduced to a neat formula.").

But the considerations include (1) whether the case was inadequately considered or wrong when it was decided;[4] (2) whether the case conflicts with other decisions;[5] and (3) whether the factual or legal underpinnings of the case have changed, including whether the case was based on a significant assumption that has proven to be erroneous.[6]

As we explain in the following sections, each of those three factors supports reconsideration of this court's decision in *Brown*. In section C, we review *Brown*. We first explain why the court's choice to create a *per se* exigency exception was not well founded. Although the case presented a state constitutional issue, this court imported federal constitutional law with little explanation of why doing so was appropriate despite the differences between state and federal constitutional protections against unreasonable searches and seizures. In addition, the court's analysis of the state constitutional rights at issue was unclear at best. We also explain that the court believed that the *per se* exception would be temporary. The premise underlying the *per se* exception is that the mobility of vehicles creates a risk that they will become inaccessible in the time it takes to get a warrant, and the court expected that advances in

---

[4] *E.g.*, *State v. Skillicorn*, 367 Or 464, 492-93, 479 P3d 254 (2021) (overruling prior decision that was internally inconsistent and had created confusion in the law); *State v. Christian*, 354 Or 22, 36-40, 307 P3d 429 (2013) (overruling prior decisions that imported federal constitutional analysis without adequately explaining why it was appropriate to do so to resolve a state constitutional issue); *Yancy v. Shatzer*, 337 Or 345, 363, 97 P3d 1161 (2004), *abrogated on other grounds by Couey*, 357 Or 460 (overruling prior case that had recognized an exception to the mootness doctrine "without undertaking any effort to determine whether such an exception was compatible with the scope of the judicial power granted under the Oregon Constitution").

[5] *E.g.*, *State v. Payne*, 366 Or 588, 606-07, 468 P3d 445 (2020) (reversing case based on conflict with subsequently decided cases); *Multnomah County v. Mehrwein*, 366 Or 295, 314, 322, 462 P3d 706 (2020) (recognizing that it is appropriate to reconsider those decisions that cannot fairly be reconciled with other decisions, and overruling prior decision that conflicted with prior and subsequent case law); *Couey*, 357 Or at 486 (overruling prior decision that could not "be fairly reconciled with other decisions of this court on the same constitutional provision"); *State v. Savastano*, 354 Or 64, 94, 309 P3d 1083 (2013) (overruling prior case that conflicted with "cases that both preceded and followed it").

[6] *E.g.*, *State v. Lawson*, 352 Or 724, 746-63, 291 P3d 673 (2012) (revising test for admissibility of eyewitness identifications because test was "incomplete and, at times, inconsistent with modern scientific findings" and "somewhat at odds with its own goals and current Oregon evidence law").

technology would reduce that time and, thereby, eliminate the need for a *per se* exception. Consequently, in section C, we conclude that, because *Brown* did not focus on state constitutional law, was based on unclear reasoning, and created a *per se* rule that the court intended to be temporary, *Brown* itself provides reasons for reconsidering its *per se* rule.

In section D, we review the automobile exception cases this court has decided since *Brown*. In *Brown*, this court created a *per se* exigency exception because it believed that doing so would provide clarity in the law regarding when officers can seize and search vehicles without warrants. Subsequent cases show, however, that *Brown*'s *per se* rule has not created the clarity that the court hoped it would. That is in part because the rule is ambiguously phrased. It is also because the rule is disconnected from its rationale: The rule is based on the asserted risk that contraband or evidence will be lost, but it applies even when there is no such risk. Because there is little logic to the rule, it is difficult to apply and has not led to clarity or stability in the law. In addition, *Brown*'s *per se* exigency exception is inconsistent with subsequently decided cases in two ways. First, it is inconsistent with this court's recent decision in *Andersen II*, which altered the *per se* nature of the exception (although the extent of that alteration is unclear because, after this court decided *Andersen II*, it decided *Bliss*, which described *Brown* as having created a *per se* rule and did not mention that *Andersen II* had altered it). Second, it is inconsistent with recent cases in which this court has made clear that the scope of an exception to the warrant requirement must be limited by the purposes of the exception. Consequently, in section D, we conclude that the cases this court has decided since *Brown* weigh in favor of revisiting *Brown*'s *per se* rule because they show that the rule has not created the clarity that the court hoped it would, that the rule is inconsistent with *Andersen II* and unclear after *Bliss*, and that the rule is at odds with this court's recent cases—decided since *Brown* and *Andersen II*—holding that a warrant exception must be applied consistently with the purposes animating the exception.

In section E, we discuss technological and legislative changes since *Brown* that weigh in favor of reconsidering its *per se* exigency exception. As mentioned, in *Brown* this court anticipated that advances in technology would make it possible to reduce the time it takes to get a warrant and, as a result, reduce the need to seize and search vehicles without warrants. *Brown* was decided in 1986, and technology has changed substantially since then. The law governing warrants has also changed: The legislature has regularly updated the statute governing warrants to expedite the warrant process for telephonic and electronic warrants. As a result, it is now possible, as *Brown* anticipated, for officers to apply for and receive warrants in a matter of minutes, not hours. Consequently, in section E, we conclude that technological and legislative changes relevant to warrant processing weigh in favor of revisiting *Brown*'s *per se* exigency exception.

Ultimately, we conclude that there are numerous reasons to reconsider *Brown*'s *per se* exigency exception. Some have existed since *Brown* itself; others have accumulated in the years since *Brown*; and still others have arisen as a result of our most recent automobile exception cases and other warrant exception cases. We further conclude that, in light of those same reasons, that *Brown* should be overruled: the *per se* exception was not well founded, it has not created clarity, it is inconsistent with recent cases, it was intended to be temporary, it is no longer justified given changes in technology and the processes for obtaining electronic warrants, and it can diminish the incentives for officers to apply for warrants and for jurisdictions to improve warrant processes.

Therefore, in section F, we hold that there is no longer a special exigency rule for vehicles. Instead, vehicles are subject to the general "exigent circumstances" exception to the warrant requirement that applies to other types of property. In order to justify a warrantless seizure or search based on exigent circumstances, the state must prove that there was a situation requiring law enforcement "to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *Stevens*, 311 Or at 126.

C.    State v. Brown

    In *Brown*, the defendant's girlfriend told two officers that the defendant had assaulted her and stolen her property. She also told them that the defendant always carried a handgun in a "black purse" either on his person or in the trunk of his car. The next day, the officers stopped the defendant while he was driving his car. The officers told the defendant that the reason for the stop was to arrest him for assault and theft, and they also told him about his girlfriend's statement regarding the handgun. After the defendant declined to consent to a search of his car, the officers searched the car without a warrant. In the trunk, they found a closed black leather bag that contained a handgun.

    One officer later testified that the defendant had been handcuffed during the entire search. The other officer could not remember when, or if, the defendant had been handcuffed, but he testified that the officers had put the defendant in their patrol car before they searched the trunk.

    Based on the discovery of the handgun, the defendant was charged with two weapons offenses. The trial court ruled that the warrantless search of the defendant's car did not violate Article I, section 9, but the Court of Appeals reversed, and this court allowed review.

    On review, the court stated that the case presented "the heretofore unanswered question: Is there "an 'automobile exception' to the warrant requirement of Article I, section 9, of the Oregon Constitution?" *Brown*, 301 Or at 274. The court emphasized that the question was one of state law and that it was "deciding th[e] case independent of federal law." *Id.* But the court did not ground its analysis in the text of Article I, section 9, or any of its cases construing that provision independently of federal law. Instead, it relied on United States Supreme Court cases construing the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 275-77.

    The court quoted *Carroll v. United States*, 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925), for the proposition that there is a difference between searches of stationary structures and searches of vehicles because vehicles "'can

be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Brown*, 301 Or at 275 (quoting *Carroll*, 267 US at 153). And the court relied on *United States v. Ross*, 456 US 798, 102 S Ct 2157, 72 L Ed 2d 572 (1982), for the proposition that, if officers have probable cause to search a vehicle for an object, they can search "'every part of the vehicle and its contents that may conceal the object.'" *Brown*, 301 Or at 279 (quoting *Ross*, 456 US at 825). Thus, the court understood *Carroll* and *Ross* as establishing that the risk that a vehicle will be moved out of a jurisdiction can create an exigency that justifies a search of the entire vehicle and its contents.

From there, the court went on to reason that

> "if police have probable cause to believe that a person's automobile, which is mobile when stopped by the police, contains contraband or crime evidence, *the privacy rights of our citizens are subjected to no greater governmental intrusion if the police are authorized to conduct an immediate on-the-scene search of the vehicle than to seize the vehicle and hold it until a warrant is obtained.* The police ticket to admission into a stopped mobile vehicle is probable cause."

*Id.* at 276 (emphasis added). Thus, it appears that the court weighed the intrusiveness of an immediate warrantless search against the intrusiveness of a later warranted search. In other words, it appears that the court assumed that officers seeking to search vehicles will always have probable cause and, therefore, warrant applications will always be granted, so there is no harm in allowing officers to conduct immediate warrantless searches.

The court repeated that reasoning later in the opinion, stating:

> "[F]or constitutional purposes no difference exists between, on the one hand, seizing and holding a car before presenting the probable cause issue to a magistrate and, on the other hand, carrying out an immediate search without a warrant. *Given probable cause to search, either course is reasonable under the Oregon Constitution.*"

*Id.* at 278 (emphasis added). That statement also indicates that, when creating its automobile exception, the court assumed away the very risk that the warrant requirement

is intended to protect against: the risk that an officer will not actually have probable cause to search.

Alternatively, it may be that the court reasoned that, given the length of time that it generally took to obtain a warrant, there was no constitutional difference between immediately searching a vehicle, on the one hand, and detaining the vehicle for the duration of the warrant process, on the other hand. In other words, it may be that the court reasoned that an immediate search is no more intrusive than a lengthy seizure.

Ultimately, the court's reasoning regarding the intrusiveness of the government actions it was comparing is unclear. What is clear, however, is that the court chose to create an exigent circumstances exception based on the risk that a vehicle will be moved and, as a result, evidence will be lost. What is also clear is that the court chose not to limit the exception to circumstances where there is an actual risk that a vehicle will be moved. Instead, in order to provide clarity to law enforcement officers, the court chose to create a categorical rule based on whether a vehicle was "mobile when stopped by the police." *Id.* at 276-78. The court explained:

> "We are convinced that adoption of a '*per se* exigency rule' is a sound approach which provides the clearest guidelines for police in conducting automobile searches. Exigencies should not be determined on a case-by-case basis. Police need clear guidelines by which they can gauge and regulate their conduct rather than trying to follow a complex set of rules dependent upon particular facts regarding the time, location and manner of highway stops."

*Id.* at 277. Consequently, the court ruled that an officer may conduct a warrantless search of a car if "(1) the car was mobile at the time it was stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence." *Id.* at 278. The court further ruled that, during such a search, an officer may look in any place "'in which there is probable cause to believe'" that the contraband or evidence "'may be found.'" *Id.* at 279 (quoting *Ross*, 456 US at 824). Applying those rules, the court held that the warrantless search of the defendant's

car and black leather bag did not violate Article I, section 9. *Id*.

Notably, the court did not intend the automobile exception to be permanent. The exception was based on the length of time it generally took to get warrants, which the court expected would be reduced in the "near future" because of advances in technology:

> "In this modern day of electronics and computers, we foresee a time in the near future when the warrant requirement of the state and federal constitutions can be fulfilled virtually without exception. All that would be needed in this state would be a central facility with magistrates on duty and available 24 hours a day. All police in the state could call in by telephone or other electronic device to the central facility where the facts, given under oath, constituting the purported probable cause for search and seizure would be recorded. The magistrates would evaluate those facts and, if deemed sufficient to justify a search and seizure, the magistrate would immediately issue an electronic warrant authorizing the officer on the scene to proceed. The warrant could either be retained in the central facility or electronically recorded in any city or county in the state. *Thus, the desired goal of having a neutral magistrate could be achieved within minutes without the present invasion of the rights of a citizen created by the delay under our current cumbersome procedure and yet would fully protect the rights of the citizen from warrantless searches.*"

301 Or at 278 n 6 (emphasis added). Thus, the court envisioned a process in which officers would call magistrates who would determine whether the officers had probable cause to search and, if the officers did, the magistrates would immediately issue electronic warrants.

*Brown* was decided by a six-person court, the same day as *State v. Bennett*, 301 Or 299, 721 P2d 1375 (1986), which also involved the warrantless seizure and search of a vehicle. In each case, four justices joined in the majority opinion. In *Bennett*, Chief Justice Peterson confessed that he was troubled by the majority's *per se* rule because it deviated from the "basic constitutional rule" that, "[i]f it is possible to get a warrant," officers should "get a warrant." 301 Or at 307 (Peterson, C. J., concurring). But, he explained, search

and seizure law at the time was unclear; the court had recently decided several cases relying on Supreme Court cases that the Supreme Court later overruled. *Id.* at 305. Believing that the majority's rule was clear and workable, Chief Justice Peterson joined in the majority with the aim of "putting the question to rest, to the end that everyone will know and understand what is the rule." *Id.* at 308.

Justice Linde dissented in *Brown*, joined by Justice Lent. The dissent argued that the majority's rule was based on a false premise: "that the mobility of a motor vehicle does not allow time to obtain a warrant to search it." *Brown*, 301 Or at 291 (Linde, J., dissenting). According to the dissent,

> "[a]s a statement about 'exigency,' the proposition that it always, or generally, is impossible to obtain a warrant to search a vehicle after it has been stopped in transit is simply contrary to fact, especially in cases where the occupants have been placed in custody outside the vehicle."

*Id.* at 292. The dissent argued that whether there is a risk that evidence will be lost if police are required to obtain a warrant is a question that should be resolved on a case-by-case basis: "Exigencies are emergencies, circumstances that require urgent action; of course they arise case by case." *Id.* In addition, the dissent pointed out that the majority's justification for it its rule did not support the breadth of the rule. According to the dissent, the majority's desire to rest its rule "on the exception for exigent circumstances and also to give police officers general permission for warrantless searches of automobiles irrespective of actual exigency leads only to an unresolved contradiction." *Id.*

The dissent also took issue with the majority's conclusion that conducting an immediate warrantless search of a vehicle is no more intrusive than holding a vehicle while a warrant is requested. *Id.* at 294-95. The dissent explained:

> "The faulty assumption is that the court must choose between the 'intrusiveness' of an immediate search and of a temporary seizure to await a warrant and make that choice as a categorical matter of law. That is not so. The obvious, and correct, alternative is that the choice belongs to the person whose constitutional interests are at stake. An officer reasonably believing that he has probable cause

to search an automobile trunk in the presence of the owner or driver can offer the person an informed choice between consenting to an immediate search or having the automobile held for the time necessary to obtain a warrant.

"This is even more obviously true of bags or other closed containers. The person, not the officer, is the one to decide whether to insist on the right to have the supposed probable cause tested by a magistrate and to accept the inconvenience of the necessary seizure. There simply is no basis for this court or any court to make such a categorical choice for all owners of automobile trunks or closed containers found in automobiles as a class. If a person insists on the required warrant, there well may be exigent circumstances for a seizure when there are not for searching a container after it has been seized."

*Id.* (footnote omitted).

In addition, the dissent cautioned that the *per se* rule would not bring clarity. *Id.* at 291-92. And, although the dissent appreciated that the majority's rule was a "temporary accommodation" and "open to future reconsideration" in the event of changes in the warrant process, the dissent thought that the state would make those desired changes sooner if the court enforced the warrant requirement instead of recognizing a new exception to it. *Id.* at 280, 293-94.

What our review of *Brown* shows is that, although the case concerned Article I, section 9, the court relied on cases construing the Fourth Amendment. That is significant because this court has a duty to analyze state constitutional provisions independently from similar federal ones. *State v. Caraher*, 293 Or 741, 756, 653 P2d 942 (1982) ("It is our belief that the citizens of Oregon are entitled to an analysis of the protections afforded by the Oregon Constitution independent of the United States Constitution."). Moreover, Article I, section 9, analysis differs from Fourth Amendment analysis. Although federal law construing the Fourth Amendment uses a "reasonable expectations of privacy" test to evaluate warrantless searches and seizures, state law construing Article I, section 9, does not. This court has expressly rejected the "reasonable expectations of privacy" approach for assessing whether a government action violates Article I, section 9. *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040

(1988). That is because "the privacy protected by Article I, section 9, is not the privacy one reasonably *expects* but the privacy to which one has a *right*." *Id.* (citing *Tanner*, 304 Or at 321 n 7) (emphases in original). For the purposes of Article I, section 9, privacy rights are determined by "an objective test of whether the government's conduct 'would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy.'" *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) (quoting *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988)).

As mentioned, seizures and searches are separate events, requiring separate justifications. *Tanner*, 304 Or at 316. Thus, in *Brown*, the court should have first analyzed whether seizure of the defendant's car was justified, and, if it was, then the court should have analyzed whether the search of the car was justified. If the court had undertaken that two-step analysis, it would have had to determine whether, after the seizure, any exigency justified the search. But the court did not undertake that analysis. Instead, it relied on federal cases, which, as we will explain, do not provide a sound foundation for *Brown*'s *per se* exigency exception to the state constitution's warrant requirement. One of those cases, *Carroll*, did not establish a *per se* exigency exception, and the other, *Ross*, establishes a *per se* exigency exception for seizures, but not searches.

In *Brown*, this court stated that, in announcing its automobile exception, it was aligning itself "with the traditional federal 'automobile exception' to the Fourth Amendment warrant requirement as set forth in the seminal case of *Carroll v. United States* \*\*\* and its progeny." 301 Or at 274. In *Carroll*, the Supreme Court did distinguish between structures and vehicles, as the *Brown* court noted. Specifically, the Court stated:

> "[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, *where it is not practicable to secure a*

*warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."*

267 US at 153 (emphasis added). But the Court did not hold that the difference between structures and vehicles justifies warrantless seizures of all vehicles, or even all vehicles that are stopped in transit. To the contrary, the Court emphasized that, when officers can get a warrant, they must get a warrant:

"*In cases where the securing of a warrant is reasonably practicable, it must be used*, and when properly supported by affidavit and issued after judicial approval protects the seizing officer against a suit for damages. In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause."

*Id.* at 156 (emphasis added). Thus, *Carroll* recognized a true exigency exception for the seizure of vehicles, that is, an exception that applies only when a seizure would be "impossible except without a warrant." *Id.*

In later cases, including *Chambers v. Maroney*, 399 US 42, 48-52, 90 S Ct 1975, 26 L Ed 2d 419 (1970), the Supreme Court relied on *Carroll* to create a *per se* exigency exception to the Fourth Amendment's warrant requirement. But, as described in *Chambers*, the exception does not apply to all vehicles; it applies only to those that are "readily movable." *Chambers*, 390 US at 51. That is, it applies in circumstances where, "if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search." *Id.*

After *Chambers*, the Court, in *Ross*, addressed the permissible scope of a search conducted pursuant to the federal automobile exception. The Court recognized that, if officers seize a vehicle, the seizure can eliminate any exigency that would justify a warrantless search. As the court explained, "although failure to *seize* a moving automobile believed to contain contraband might deprive officers of the illicit goods, once a vehicle has been stopped the exigency does not necessarily justify a warrantless search." *Ross*, 456

US at 807 n 9 (emphasis in original). As Justice Marshall observed, where law enforcement can seize a vehicle such that it is "in the exclusive control of the authorities"—for example, after its occupants have been arrested—a warrantless search is justified not on the basis of any exigency, but on another basis: the reduced expectation of privacy individuals have in their vehicles. *Id.* at 830 (Marshall, J., dissenting).

To summarize, in *Brown*, this court did not engage in an independent analysis of Article I, section 9. Instead, it relied on federal Fourth Amendment law to create a *per se* exigency exception that allows not only for warrantless seizures of vehicles, but also for warrantless searches of seized vehicles. And it did so even though *Carroll* did not establish a *per se* exigency exception, and *Ross* does not support a *per se* exigency exception for searches of seized vehicles.

Moreover, as described above, the court's reasoning is unclear. The court either reasoned that an immediate warrantless search is no more intrusive than a later warranted search, in which case it failed to recognize the purpose of the warrant requirement, which is to protect against searches that are not supported by probable cause. Or it reasoned that an immediate warrantless search is no more intrusive than a prolonged seizure, but, as Justice Linde explained, that reasoning was unsound. Thus, *Brown* itself provides several bases for reconsidering its *per se* exigency exception: the court did not utilize its usual framework for analyzing a state constitutional question, it imported federal law without adequate explanation, and its reasoning is unclear at best. *See Farmers Ins. Co.*, 350 Or at 698 (recognizing that reconsideration of a prior decision is appropriate where the court had "failed to apply [the] usual framework for decision or adequately analyze the controlling issue").

To be sure, several of those aspects of *Brown* were apparent at the time the case was decided and were mentioned by the dissent. But it is still appropriate to consider them here because, when determining whether to adhere to precedent this court considers, among other things, whether a case was inadequately considered or wrong when it was decided.

In addition, when it comes to the doctrine of *stare decisis*, *Brown* is a unique case. The court did not intend its *per se* exigency exception to be permanent. It expected that, in the "near future," technological changes would occur and reduce the amount of time that it took to process a warrant application and, as a result, there would be no basis for assuming as a general matter that obtaining a warrant would create a risk that a vehicle would be moved before it could be seized or searched. *Brown*, 301 Or at 278 n 6. *Brown*'s *per se* exigency exception was intended as a temporary accommodation to provide clarity to officers. But, as we explain in the following section, it has not provided that clarity, and it is now in conflict with other cases—two additional reasons to reconsider *Brown*'s *per se* rule.

## D.   *Post*-Brown *Cases*

In *Brown*, the court announced its *per se* rule that an officer may conduct a warrantless search of a car if "(1) the car was mobile at the time it was stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence." 301 Or at 278. Although the rule was intended to create clarity in the law, post-*Brown* cases show that there has been confusion about the basic elements of the rule, including about what it means for a vehicle to be mobile, whether the police need to bring a moving vehicle to a stop, and at what point police need to have probable cause.

### 1.   State v. Kock

In *Brown*, the police stopped the defendant's car when the defendant was driving it. Consequently, the court did not address "whether a warrant for the search and seizure of a parked or impounded automobile is required." *Id*. at 277. But, three months after *Brown*, the court addressed the warrantless search of a parked car. *State v. Kock*, 302 Or 29, 725 P2d 1285 (1986).

In *Kock*, two officers conducting surveillance in the parking lot of the store where the defendant worked saw the defendant come to work and enter the store. Approximately two hours later, the officers saw the defendant leave the store, place a package in his car, and return to the store.

To determine what the defendant had put in his car, the officers searched the car without a warrant and seized the package, which contained merchandise from the store. The state charged the defendant with theft, and the defendant moved to suppress the results of the search.

On review, this court assumed for the sake of argument that the officers had probable cause to search the car and, therefore, the court focused on whether the search was lawful under an exception to the warrant requirement. *Id*. 32-33. As relevant here, the court held that the search was not lawful under the automobile exception. *Id*. at 33. The court explained that it was adhering to the rule it had announced in *Brown*:

> "Although logically it can be argued that the rationale of the seminal case of *Carroll v. United States* and its progeny, including *United States v. Ross*, would justify extending the automobile exception to automobiles that are capable of mobility, we elect to draw the so-called bright line of *Brown* just where we left it in that case: *** [A]utomobiles that have just been lawfully stopped by police may be searched without a warrant and without a demonstration of exigent circumstances when police have probable cause to believe that the automobile contains contraband or crime evidence."

*Id*. at 32-33 (citations omitted). The court further explained that *Brown* established the "outer limit for warrantless automobile searches without other exigent circumstances." *Id*. at 33. Therefore, the court ruled:

> "Any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent circumstances other than the potential mobility of the automobile exist."

*Id*. Applying that rule, the court held that, because the state had "failed to demonstrate any individualized exigent circumstances," the warrantless search of the defendant's car violated Article I, section 9. *Id*. at 33-34.

In sum, the automobile exception did not apply in *Kock* because the defendant's car was parked and unoccupied

when the officers "first encountered it in connection with the investigation of a crime"—that is, when the officers first developed probable cause. Thus, *Kock* indicates that officers "encounter" a car in connection with a crime when they have probable cause to seize or search it, not simply when they see it. It also indicates that the exception does not apply simply because a car was recently driven and the person who drove it is still nearby, and, relatedly, that "mobile" means "moving," not "operable or capable of moving."

2.    State v. Meharry

Following this court's decision in *Kock*, the Court of Appeals held that the automobile exception did not apply to the warrantless search of a van that was parked when an officer developed probable cause to search it. *State v. Meharry*, 201 Or App 609, 617-18, 120 P3d 520 (2005) (*Meharry I*), *rev'd*, 342 Or 173 (2006). In *Meharry*, a local fire chief saw a van being driven erratically and reported his observations to a police officer, who spotted the van and followed it in his patrol car, without using his siren or overhead lights. The officer saw the defendant drive the van into the parking lot of a convenience store, park, and go into the store. The officer parked his patrol car behind the van and went into the store, where he questioned the defendant and developed probable cause to believe that the defendant had been driving under the influence of intoxicants. The defendant agreed to take field sobriety tests outside the store, and, after she failed the tests, the officer arrested her. After finding a syringe in the defendant's pocket, the officer then conducted a warrantless search of the van. Based in part on evidence found during that search, the state charged the defendant with driving under the influence of intoxicants and with several drug crimes.

The defendant moved to suppress the evidence found in the warrantless search of the van, and the trial court granted the motion. The Court of Appeals affirmed, relying on *Kock* and holding that the van was not mobile when the officer first encountered it. *Meharry I*, 201 Or App at 617-18. Quoting an earlier case in which it had addressed the scope of the automobile exception, the court stated that, "'although the meaning and contours of "encounter" as used

in the case law are somewhat amorphous, it is clear that merely observing a vehicle from a distance without any show or exercise of police authority is not an "encounter" for purposes of the automobile exception.'" *Id.* at 618 (quoting *State v. Mosely*, 178 Or App 474, 479, 38 P3d 278 (2001), *rev den*, 334 Or 121 (2002)). Applying that understanding, the court concluded that the automobile exception did not apply. *Id.*

On review, this court reversed the Court of Appeals' decision. *State v. Meharry*, 342 Or 173, 149 P3d 1155 (2006) (*Meharry II*). Although the *Brown* rule is that an officer may seize and search a car if (1) the car was mobile at the time it was stopped by the police, and (2) the police have probable cause to believe that the car contains contraband or crime evidence, this court concluded that it did not matter that the officer had not caused the defendant's van to stop or that the defendant had parked the van and gone into the store before the officer parked his patrol car behind it. The court noted that the officer had seen the van being driven shortly before he searched it, that the officer "had not impounded the van," and that "there was no physical or mechanical impediment to the van's being driven away once [the officer] relinquished control over it." *Meharry II*, 342 Or at 180. Therefore, the court concluded, "*the van remained mobile* and the exigency continued." *Id.* (emphasis added).

Thus, although in *Brown* the court appeared to use the term "mobile" to mean "moving," 301 Or at 277, and in *Kock* the court expressly declined to extend the automobile exception to vehicles that are "capable of mobility," 302 Or at 32-33, the court in *Meharry II* appeared to use the term "mobile" to mean capable of movement, concluding that the defendant's parked van "remained mobile," 342 Or at 180.

Justice Durham concurred in the court's decision, noting that the defendant had not argued that the court had erred in *Brown*. *Id.* at 182 (Durham, J., concurring). He wrote separately to raise two concerns about *Brown*. One concern was that *Brown* "understated the constitutional policy requiring a judicial examination of the particular facts to determine whether a particular search is reasonable." *Id.* at 181. In Justice Durham's view, "The one-size-fits-all rule of *Brown* for searching a citizen's property is difficult

to harmonize with the state constitutional prohibition on searches that are not reasonable under all the particular circumstances." *Id.* at 181-82. The other concern was that "the *Brown* court's decision oversold the notion that it would lead to certainty," because "whether a vehicle is 'mobile,' or *sufficiently* mobile under the particular facts to permit a warrantless search, can change with every stop." *Id.* at 181 (emphasis in original).

   3.   State v. Kurokawa-Lasciak

        Unsurprisingly, after *Meharry II*, the Court of Appeals held that the automobile exception applied to a vehicle because the vehicle was capable of moving at the time an officer developed probable cause. *State v. Kurokawa-Lasciak*, 237 Or App 492, 239 P3d 1046 (2010) (*Kurokawa-Lasciak I*), *rev'd*, 351 Or 179 (2011). In *Kurokawa-Lasciak*, casino officials suspected the defendant of money laundering, and, when the defendant refused to provide identification, the officials barred him from making future transactions and distributed a photograph of him to all the casino's cashiers. When the defendant saw one of the photographs, he grabbed it and walked away. A casino employee then alerted a state trooper assigned to the casino as a gaming detective. Video surveillance showed that the defendant left the casino, walked to his rental van in the casino's parking lot, drove to a gas station operated by the casino, and then returned to the parking lot with his girlfriend, parked the van, and began walking back to the casino. When the defendant was approximately 30 feet from the van, a deputy sheriff stopped and detained him until the state trooper arrived. Neither the deputy nor the trooper had seen defendant drive the van and neither had reviewed the video surveillance before contacting the defendant.

        The trooper questioned and arrested the defendant, who refused to consent to a search of the van. The trooper then questioned the defendant's girlfriend, Campbell, asking, among other things, whether there was any marijuana in the van. Campbell answered that there was a "little bit," and that it was "probably under [an ounce], but could be over a little bit." Ultimately the trooper obtained Campbell's consent to a search of the van and searched it, finding several

ounces of marijuana and hashish, electronic gram scales, and approximately $48,000 in cash.

The defendant moved to suppress the evidence obtained through the search, and the trial court granted his motion, ruling that Campbell's consent was involuntary and the automobile exception did not apply because the trooper did not have probable cause to search the van until Campbell admitted that there were drugs inside it and, at that time, the van was not mobile. The Court of Appeals reversed on the ground that the van was mobile. *Kurokawa-Lasciak I*, 237 Or App at 499. The court noted that, although in *Kock* this court had "in no uncertain terms rejected the theory that the exception extended to 'stationary but operational vehicle[s],'" the courts had since "'refined the automobile exception analysis,'" and "at present, a vehicle is 'mobile' for purposes of the automobile exception as long as it is operable." *Id.* at 497-98 (first quoting *Kock*, 302 Or at 33; then quoting *State v. Coleman*, 167 Or App 86, 92, 2 P3d 399 (2000); and then citing *Meharry II*, 342 Or at 181).[7]

---

[7] When doing so, the Court of Appeals mentioned the lack of stability in the case law applying the automobile exception, commenting that the exception had "what charitably might be called an irregular history." *Kurokawa-Lasciak I*, 237 Or App at 497.

Earlier, in *State v. Snow*, 179 Or App 222, 226-27, 39 P3d 909 (2002), *aff'd*, 337 Or 219, 94 P3d 872 (2004), the court had similarly stated that "the exception's development [had] not necessarily always been internally consistent." In *Snow*, the court recapped the following automobile exception cases, which illustrate that inconsistency. *Id.* at 227-31.

In *State v. Vaughn*, 92 Or App 73, 77, 757 P2d 441, *rev den*, 306 Or 661 (1988), the court held that a vehicle was not mobile because, even though officers had seen it moving earlier, it was parked and unoccupied when the officers confronted its driver about criminal activity.

Then, in *State v. Cromwell*, 109 Or App 654, 659, 820 P2d 888 (1991), the court held that a vehicle was mobile—even though officers had not seen it move and its engine was not running—because it was parked in the middle of the roadway with its parking lights on and the defendant was in the driver's seat when the police developed probable cause that it contained contraband.

Next, in *State v. Warner*, 117 Or App 420, 424, 844 P2d 272 (1992), the court held that a vehicle was not mobile, even though an officer had seen it moving, because it appeared to be having mechanical problems when the police developed probable cause to search it.

Later, in *State v. Burr*, 136 Or App 140, 150, 901 P2d 873, *rev den*, 322 Or 360 (1995), the court held that a pickup truck was mobile, even though officers had never seen it move and no one was in it, because it was "parked along a public highway at night in an isolated area" and four persons were attempting to load a raft into it shortly before the officers developed probable cause to search it.

On review, this court reversed the decision of the Court of Appeals, noting that "the court in *Meharry* did not dispense with the *Brown* and *Kock* requirement that, to qualify for the automobile exception, the vehicle that the police search must be mobile at the time that the police encounter it in connection with a crime." *Kurokawa-Lasciak II*, 351 Or at 192. The court explained that its statement in *Meharry II*, that the defendant's van "remained mobile" after it was parked, was "only to correct the Court of Appeals' statement that the initial exigency no longer existed when the police searched the van." *Id.* The court further explained that it had not intended that statement "to eliminate the requirement of the automobile exception that the vehicle be mobile at the time of the initial encounter or to replace it with a requirement of operability at the time of the initial encounter." *Id.* at 193. Applying that requirement, the court found that the deputy had stopped the defendant 30 feet from his van, which was parked, immobile, and unoccupied, and that, when the trooper questioned the defendant, they were no longer near the van. *Id.* at 194. Thus, the court concluded, "there was no evidence from which the trial court could have found that defendant's van was mobile when [the deputy] or [the trooper] encountered it in connection with a crime" and the automobile exception did not apply. *Id.*

### 3.  State v. Andersen

In this court's next automobile exception case, *Andersen II*, 361 Or 187, the issue related to what constitutes an "encounter." In that case, two officers were waiting for the defendant's car to arrive at a parking lot to complete a drug sale arranged through a confidential informant. The first officer overheard a cellphone conversation between the defendant's passenger and the informant, in which the passenger told the informant that the defendant's

---

But, in *State v. Coleman*, 167 Or App at 96, the court held that the defendant's car was not mobile, even though the defendant was a few feet from it when the officers first saw him, because it was unclear whether the officers focused their attention on the car before or after they arrested the defendant.

As that relatively small sample of cases shows, the *Brown* rule—that an officer may search a vehicle without a warrant if the vehicle was mobile when the officer first encountered it and the officer has probable cause—has given rise to questions regarding what it means for a car to be mobile, what constitutes an encounter, and when the officer must have developed probable cause.

car was arriving at the parking lot. The second officer then drove to another area of the parking lot, where he saw the defendant's car parked with the motor running. Both officers approached the car and prevented it from leaving until a drug detection dog arrived and alerted to the presence of drugs, giving the officers probable cause to search the car. The officers searched the car and its contents without a warrant and discovered drugs in the defendant's purse, which she later moved to suppress. The trial court denied the defendant's motion, ruling "that this was a mobile vehicle, as that term is meant in the vehicle exception," but the Court of Appeals reversed on the ground that the police had not encountered the car until it was parked. *State v. Andersen*, 269 Or App 705, 346 P3d 1224 (2015) (*Andersen I*), *rev'd*, 361 Or 187 (2017).

On review, this court held that, although the officers did not see the defendant's car drive into the parking lot, the running account of the car's movement provided by the defendant's passenger provided them with confirmation that the car was mobile, despite the fact that it was parked when officers first saw it in the parking lot. *Andersen II*, 361 Or at 198. The court therefore concluded that the car was mobile when the police first encountered it in connection with a crime. *Id.*

In *Andersen II*, the defendant had argued that, if this court concluded that the search of his car came within the automobile exception, as the court's cases had described it, then the court should overrule the exception. The court declined to do so, and it wrote to address the defendant's argument that the court "should overrule *Brown* because warrants can now be obtained within minutes." *Id.* at 199. The court questioned the defendant's premise, observing that although technological advances can reduce the amount of time required for communications during the warrant process, other aspects of the process—which can include the completion of a written warrant application by an officer and the review of that application by a district attorney—can take substantial amounts of time. *Id.* at 200.

But the court acknowledged that there may be circumstances where the exception will no longer apply:

"We do not foreclose the possibility that *Brown* held out—that changes in technology and communication could result in warrants being drafted, submitted to a magistrate, and reviewed with sufficient speed that the automobile exception may no longer be justified in all cases. Nor do we foreclose a showing in an individual case that a warrant could have been drafted and obtained with sufficient speed to obviate the exigency that underlies the automobile exception. *See State v. Machuca*, 347 Or 644, 657, 227 P3d 729 (2010) (explaining that, under Article I, section 9, the exigency arising from the dissipation of alcohol ordinarily will permit a warrantless blood draw while recognizing that the particular facts in an individual case may show otherwise); *cf. Missouri v. McNeely*, 569 US 141, [163-65,] 133 S Ct 1552, 185 L Ed 2d 696 (2013) (rejecting the state's argument that the exigency resulting from the dissipation of alcohol will be present in every case)."

*Id.*

    In a concurrence, then-Justice Walters highlighted the significance of that paragraph, stating that in it the majority recognized "that the exception created in [*Brown*] is and must be aligned with other Oregon exigency exceptions to the warrant requirement." *Id.* at 202 (Walters, J., concurring).[8] Justice Walters explained that this court "has long held *** that whether exigent circumstances exist must be determined based on the particular facts presented, and not on a categorical basis or pursuant to a *per se* rule." *Id.* She further explained:

"In permitting that same case-by-case analysis when the state relies on the automobile exception to justify a warrantless search, the majority assures that, unless exigent circumstances are actually present, a neutral magistrate, and not the individual who performs the search, will determine whether there is probable cause to search. That mode of analysis is essential to protect Oregonians' right to privacy. Any other rule would 'improperly ignore the current and future technological developments in warrant procedures,' and 'diminish the incentive for jurisdictions "to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while

_____

    [8] Justice Walters became Chief Justice in 2018, after *Andersen II*, but before *Bliss*.

meeting the legitimate interests of law enforcement."' *McNeely*, [569 US at 156] (quoting *State v. Rodriguez*, *** 156 P3d 771, 779 (2007))."

*Id.*

        *Andersen II* is significant because it altered the signature aspect of the *Brown* rule. In *Brown*, the court held that nothing "in addition to the mobility of an automobile at the time it is lawfully stopped is required to create exigency under the automobile exception." 301 Or at 277. To illustrate, the court stated:

> "[I]t does not matter whether the passenger could have taken over the custody of the car ***, whether the police had adequate personnel to back-up the arrest, whether a tow truck was available, *whether a magistrate was available by telephone or otherwise*, or whether a threatening crowd gathered, etc."

*Id.* at 278 (emphasis added; footnote omitted). Thus, under *Brown*, whether an exigency exists does not depend on case-specific facts, other than whether the vehicle at issue was mobile when it was stopped and whether probable cause exists. It "does not matter" whether, for example, a warrant could have been obtained. *Id.* But, under *Andersen II*, it does.

    4.   State v. Bliss

        The effect of *Andersen II* is unclear, however, because of this court's most recent automobile exception case, *Bliss*, 363 Or 426. The defendant in *Bliss* did not challenge the automobile exception itself; he argued only that the exception did not apply in his case because he had been stopped in connection with a traffic violation and not in connection with a crime. Noting that *Brown* was intended to create a bright-line rule that established the outer limits of the automobile exception, the defendant relied on several of this court's cases in which this court considered the mobility of a vehicle at the time the police encounter it "in connection with a crime." *E.g.*, *Kurokawa-Lasciak II*, 351 Or at 192 (affirming that "to qualify for the automobile exception, the vehicle that the police search must be mobile at the time that the police encounter it in connection with a crime"); *Andersen II*, 361 Or at 197 (same); *Kock*, 302 Or at

33 (considering the mobility of a car when "the police first encountered it in connection with the investigation of a crime"). This court rejected the defendant's argument, concluding that its prior use of the phrase "in connection with a crime" merely described the facts of the cases in which the phrase was used and was not intended to be a requirement. *Bliss*, 363 Or at 437.

Because the defendant's argument was that the automobile exception did not apply to stops like his at all, the court did not address whether, as it had just stated in *Andersen II*, there could be circumstances in which a warrant could be obtained quickly enough to obviate the exigency underlying the exception. But, in rejecting the defendant's argument, the court stated that

> "much of the rationale of *Brown* was to provide law enforcement with 'simple guidelines' and a '*per se*' rule for all highway stops, rather than a 'complex set of rules dependent on particular facts regarding the time, location and manner' of the stop. \*\*\* Defendant's proposed distinction between stops based on traffic violations and stops based on criminal activity would be complex in practice and undercut the clarity *Brown* sought to establish."

*Bliss*, 363 Or at 434 (quoting *Brown*, 301 Or at 277). Thus, although this court altered the *per se* nature of the automobile exception in *Andersen II*, in *Bliss* it based its decision in part on the court's goal of providing a *per se* rule.

Chief Justice Walters dissented in *Bliss* and was joined by Justice Nakamoto. Noting that, in *Kurokawa-Lasciak II*, this court had stated that "'the "automobile exception" to the warrant requirement of Article I, section 9, of the Oregon Constitution, does not permit a warrantless search of a defendant's vehicle when the vehicle is parked, immobile, and unoccupied at the time that the police encounter it *in connection with a crime*,'" the dissent would have held that the exception does not apply to vehicles that were mobile when stopped for a traffic violation, but were not mobile when the police later developed probable cause that a defendant had committed a crime. *Bliss*, 363 Or at 439 (Walters, C.J., dissenting) (quoting *Kurokawa-Lasciak II*, 351 Or at 181) (emphasis added). Therefore, the dissent

would have concluded that the officers were not permitted to search the defendant's vehicle based on an assumed exigency; instead, they had to either obtain a warrant or rely on another exception to the warrant requirement. *Id.* at 439.

5. *Summary of post-*Brown *automobile exception cases*

What our review of cases from *Brown* to *Bliss* shows is that the automobile exception has created confusion and is currently unclear. The purpose of the exception is to enable officers to respond to the risk that contraband or evidence will be lost because a vehicle can be moved out of the jurisdiction in which a warrant must be sought. But the scope of the exception exceeds its purpose. Although it is an exigent circumstances exception, it applies when there are no exigent circumstances. That is, it applies when there is no actual risk that a vehicle will be moved and that contraband or evidence will be lost.

Of course, that is because the exception is a *per se* exception, intended to provide clarity for law enforcement officers. So, instead of focusing on whether there is a risk that a vehicle will be moved, officers (and lawyers and judges) must focus on the rule as this court has phrased it. Thus, there is a disconnect between the rationale for the rule and the rule itself, and that can be confusing. *See, e.g.*, *Kurokawa-Lasciak II*, 351 Or at 193 (acknowledging the "logic of the state's position" that it is just as likely that a person in control of an operable car that was parked when the police encountered it will drive away with evidence or contraband as will a person who was in control of an operable car that was moving when the police encountered it); *Kock*, 302 Or at 32 (recognizing that it could be logically argued that the exception should be extended to vehicles that are capable of mobility).

Moreover, the phrasing of the rule has created confusion. In *Brown*, this court held that an officer may conduct a warrantless search of a car if "(1) the car was mobile at the time it was stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence." 301 Or at 278. And, in *Kock*, this court added that "any search of an automobile that was parked,

immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent circumstances other than the potential mobility of the automobile exist." 302 Or at 33. Courts have disagreed about the basic elements of the exception. There has been confusion about the meaning of "mobile," what constitutes an "encounter," and whether the encounter must be in "connection with a crime." And the confusion has not been minor: In *Meharry*, *Kurokawa-Lasciak*, and *Andersen*, the Court of Appeals understood the rule one way, and this court understood it another.

In addition, *Brown* is in conflict with other, more recent cases. Most notably, it is in conflict with *Andersen II*, as described above. That conflict is another reason to revisit *Brown*'s *per se* exigency exception and clarify its current status.

The state argues that we should adhere to *Brown*'s *per se* rule because the defendant in *Andersen II* made some of the arguments that defendant makes in this case and the court in *Andersen II* declined to overrule *Brown*'s *per se* rule.  But *Andersen II* did not affirm that rule; it altered it. Consequently, *Andersen II* does not support the state's claim that we should adhere to *Brown*.

The state also relies on *Bliss*, but as discussed, the defendant in *Bliss* did not raise the issue of whether the automobile exception is a *per se* rule. The defendant's "sole argument" was that the exception "does not apply when the initial stop is for a traffic violation, rather than for a criminal offense." *Bliss*, 363 Or at 430. The defendant did not argue that the exception requires an actual exigency, as defendant does here. Thus, *Bliss* does not resolve the question in this case. Instead, in light of *Andersen II*, it raises questions about the current status of the exception.

6.  *Other post-*Brown *warrant exception cases*

In addition to the automobile exception cases just described, other cases decided since *Brown* (and since *Andersen II*) support reconsideration of *Brown*'s *per se*

exigency exception. Those cases concern other exceptions to the Article I, section 9, warrant requirement, and they make clear that a warrant exception "must be applied consistently with the purposes animating the exception." *Fulmer*, 366 Or at 233-34. In other words, "the contours of the particular exception are circumscribed by the justification for that exception." *Id.* at 234; *see also State v. Arreola-Botello*, 365 Or 695, 712, 451 P3d 939 (2019) (holding that the scope of a stop is limited by its purpose, and therefore an officer's conduct during a stop must be "reasonably related to the purpose" of the stop). Those cases support the conclusion that *Brown*'s *per se* rule is impermissibly overbroad in that it allows for seizures and searches that are not justified by the purpose of the exception.

Moreover, since *Brown*, both this court and the Supreme Court have recognized problems with *per se* exceptions to warrant requirements. In *McNeely*, the Court rejected an argument that the natural metabolization of alcohol in the bloodstream establishes a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all cases involving driving under the influence of alcohol. 569 US at 165.

In doing so, the Court acknowledged that "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test," but it determined that each case should be decided on its own facts, and that a *per se* rule would reflect "'considerable overgeneralization.'" *Id.* at 153 (quoting *Richards v. Wisconsin*, 520 US 385, 393, 117 S Ct 1416, 137 L Ed 2d 615 (1997)). In addition, the Court observed that a *per se* rule would "improperly ignore the current and future technological developments in warrant procedures, and might well diminish the incentive for jurisdictions 'to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement.'" *Id.* at 156 (quoting *Rodriguez*, 156 P3d at 779). And, as Justice Sotomayor explained, "[w]hile the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption

of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 158 (opinion of Sotomayor, J.). Moreover, "a case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality-of-the-circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments." *Id.*

Thus, even in circumstances where the sought-after evidence is actually dissipating, the Court declined to create a *per se* rule. Such a rule would be overbroad, could discourage the development and utilization of improvements to the warrant process, and was not necessary.

Following *McNeely*, this court has also expressed concern about creating broad exceptions to the warrant requirement based on generalizations about the length of time it takes to get a warrant. For example, in *State v. Fessenden/Dicke*, 355 Or 759, 333 P3d 278 (2014), this court stated:

> "The fact that an exception to the Article, I, section 9, warrant requirement is at issue is an additional reason for caution. Since 1986, this court has been aware that, 'in this modern day of electronics and computers,' a day will come when the warrant requirement can be fulfilled expeditiously. *** *Brown*, 301 Or [at] 278 n 6 ***; *see also* *** *Kurokawa-Lasciak* [*II*], 351 Or [at] 188 *** (discussing desirability of 'a neutral magistrate's evaluation of probable cause' and anticipating 'advances in technology permit[ting] quick and efficient electronic issuance of warrants'). In many places and circumstances, obtaining a warrant no longer entails undue delay or prevents timely police action. *See Riley v. California*, [573] US [373, 401], 134 S Ct 2473, 189 L Ed 2d 430 (2014) (discussing '[r]ecent technological advances' that have 'made the process of obtaining a warrant itself more efficient'); *** *McNeely*, [569] US [at 173] (Roberts, C.J., concurring in part and dissenting in part) (describing jurisdiction where warrants may be obtained electronically in as little as 15 minutes). Given the perplexing questions presented and the current state of technology, we are hesitant to extend or

broadly apply exceptions to the warrant requirement with-
out firm constitutional basis.”

*Id.* at 771.

Not only can a *per se* exception diminish the incen-
tive for improving warrant processes, but it can also under-
mine the warrant requirement by allowing officers to plan to
conduct warrantless searches even when they could obtain
warrants. *State v. Colman-Pinning*, 302 Or App 383, 461
P3d 994 (2020), illustrates that possibility. In that case, offi-
cers working with an informant arranged a drug buy and
“planned to rely on the automobile exception announced in
*Brown* to stop defendant and conduct a warrantless search
of [his] pickup while he was on his way to the arranged
drug buy.” *Id.* at 384-85. The officers planned the stop in
advance, which one of the officers described as a “very com-
mon” practice. *Id.* at 386. The defendant was charged with
drug crimes based on evidence found during the stop, and
he moved to suppress the evidence on the ground that the
warrant search of the pickup violated Article I, section 9.
The trial court denied the motion, and the Court of Appeals
affirmed, explaining that *Brown*’s *per se* rule allows offi-
cers to plan to stop vehicles in order to conduct warrantless
searches. *Id.* at 393-94. The court recognized

> “the dissonance between a planned operation designed
> to ensnare a suspect at a particular time and place in
> order to take advantage of the automobile exception, like
> the one here, and the fact that the automobile exception
> to the warrant requirement is an *exigent circumstances*
> exception. That is, we typically view an exigency as an
> *unforeseen* circumstance that requires *urgent action*, and,
> the orchestrated method used by law enforcement in this
> case—an apparently regular practice in Lincoln County—
> does not have those qualities, which are ordinarily present
> in the type of traffic stop to which the automobile excep-
> tion is intended to apply. Nevertheless, as we explained in
> *McCarthy*, the Supreme Court has made clear the *per se*
> nature of the automobile exception, and we consequently
> cannot say that the police officers in this case were unjus-
> tified in planning the operation and relying on the automo-
> bile exception in the manner that they did, without having
> an obligation to seek a warrant.”

*Id.* at 394 (emphases in original).

In sum, cases decided since *Brown* show that *Brown*'s *per se* exigency exception has not created clarity in the law, is in conflict with other, more recent cases, is the type of rule that both this court and the Supreme Court have recognized is overbroad, is not necessary given advances in technology that can eliminate undue delay, and can diminish the incentives for making improvements to the warrant process and obtaining warrants when it is practicable to do so.

E.   *Post-*Brown *Technological and Legislative Changes*

In addition to the case law developments since *Brown*, there have been technological and legislative changes that support reconsidering *Brown*'s *per se* exigency exception. When *Brown* was decided in 1986, "[i]t was the present unavailability of a general speedy warrant procedure that led the court to allow an exception for warrantless searches after stops of mobile vehicles." *State v. Wise*, 305 Or 78, 82 n 3, 749 P2d 1179 (1988). But, as described above, the court anticipated that that situation would change, stating, "In this modern day of electronics and computers, we foresee a time in the near future when the warrant requirement of the state and federal constitutions can be fulfilled virtually without exception." *Brown*, 301 Or at 278 n 6. The court envisioned a process in which an officer would call a magistrate at a central facility and make a recorded statement under oath describing the facts that the officer believed constituted probable cause to seize or search a vehicle, the magistrate would evaluate the facts, and, if the magistrate concluded that they were sufficient to justify the intended seizure or search, the magistrate would immediately issue an electronic warrant. *Id.* That way, the court explained, "the desired goal of having a neutral magistrate could be achieved within minutes without the present invasion of the rights of a citizen created by the delay under our current cumbersome procedure and yet would fully protect the rights of the citizen from warrantless searches." *Id.*

In the 35 years since *Brown*, technology has advanced more than the court even imagined. Computers and smartphones have made instant, wireless communication not only possible, but commonplace. *See Riley*, 573 US at 385 (noting that cellphones "are now such a pervasive

and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").[9] Law enforcement officers and magistrates have computers and smartphones. Not only can officers call and speak to magistrates from the field, but they can also make and send audio and video recordings; they can prepare, sign, and send documents; and they can have recorded videoconferences with multiple other people. Advances in technology have enabled officers and district attorneys to more quickly and easily prepare, exchange, and record information necessary to apply for warrants and enabled magistrates to more quickly and easily review that information and issue and record warrants.

As the Supreme Court has observed, "[w]ell over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing." *McNeely*, 569 US at 154-55. Those processes can "enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion." *Id.* at 155. And, as Chief Justice Roberts has described, it is now possible for warrants to be obtained in less than 15 minutes:

> "At least 30 States provide for electronic warrant applications. *** Utah has an e-warrant procedure where a police officer enters information into a system, the system notifies a prosecutor, and upon approval the officer forwards the information to a magistrate, who can electronically return a warrant to the officer. Judges have been known to issue warrants in as little as five minutes. And in one county in Kansas, police officers can e-mail warrant requests to judges' iPads; judges have signed such warrants and e-mailed them back to officers in less than 15 minutes."

*Id.* at 172-73 (Roberts, C.J., concurring) (internal citations omitted).[10] Even before the advent of current e-warrant

---

[9] *See also* Mobile Fact Sheet (Apr 7, 2021), Pew Research Center, https://www.pewresearch.org/internet/fact-sheet/mobile/ (noting that 97% of adults in the United States own some sort of cellphone, and 85% own a smartphone).

[10] *See also Andersen II*, 361 Or at 203 (Walters, J., concurring) (observing that "[e]vidence from other jurisdictions suggests that police officers should be able to

technology, law enforcement could still obtain telephonic warrants in well under an hour. *See, e.g.*, *State v. Flannigan*, 194 Ariz 150, 154, 978 P2d 127 (Ariz Ct App 1998) ("[T]he Mesa Police Department is able to obtain a [telephonic] warrant within as little as fifteen minutes and that delays of only fifteen to forty-five minutes are commonplace."); *United States v. Baker*, 520 F Supp 1080, 1084 (SD Iowa 1981) (noting that obtaining a telephonic warrant after probable cause arose in a drug sting operation "would probably not have taken more than 20 minutes, 30 at the most").

Not only has the technology changed since *Brown*, but the statute governing the warrant process has changed as well. When *Brown* was decided, ORS 133.545 authorized warrants based on oral statements, commonly referred to as "telephonic warrants," but only when circumstances made it "impracticable for a district attorney or police officer to obtain a warrant in person." ORS 133.545 (1985). And it required that the oral statements be recorded and transcribed. *Id.* Since then, the legislature has regularly updated ORS 133.545 to authorize increased use of telephonic warrants, to simplify the telephonic warrant process, and to keep pace with changes in technology.

In 1999, the legislature amended ORS 133.545 to enable district attorneys and police officers to obtain

_____

obtain warrants in less than one hour"); *State v. Hawley*, No. 2015AP1113-CR, 2018 WL 8221526 at *3 (Wis Ct App Nov 21, 2018) (officers testified that obtaining a warrant for a blood draw would have taken 30 to 45 minutes); Lindsey Erin Kroskob, *Police Take First Forced Blood Draw*, Wyoming Trib. Eagle (Aug 19, 2011), https://www.wyomingnews.com/news/police-take-first-forced-blood-draw/article_2a6c7748-c565-55b5-89ae-bb411b5d80af.html (According to the Police Chief of the Cheyenne, Wyoming, Police Department, obtaining a search warrant over the phone usually takes under five minutes.); *Gazette Opinion: Evidence Shows Value of DUI Search Warrants*, Billings Gazette (May 30, 2012), https://billingsgazette.com/news/opinion/editorial/gazette-opinion/gazette-opinion-evidence-shows-value-of-dui-search-warrants/article_f0d1513d-beb1-54b2-a903-b22ca26d2d7c.html (noting that, in Billings, Montana, it takes about fifteen minutes to obtain a telephonic search warrant from the time an officer develops probable cause that a suspect was driving under the influence of intoxicants); Palm Bay Police, *Innovative Policing Creating a Safer Community* at 10 (2011) (discussing expedited warrant process that involves emailing an affidavit to a judge and then videoconferencing with the judge via Skype, allowing officers to obtain blood search warrants and arrest warrants in "an average of less than thirty minutes in comparison to several hours it would have taken using traditional means"), *archived at* https://web.archive.org/web/20120510122330/https://www.palmbayflorida.org/police/documents/annual_report_2011.pdf.

warrants even in situations where it is practicable to obtain a warrant in person. Or Laws 1999, ch 56, § 1. The 1999 amendments also permitted district attorneys and police officers to submit proposed warrants and accompanying affidavits to courts "by facsimile *** or any similar electronic transmission," and permitted courts to return signed warrants to a district attorney or police officer by the same electronic means. *Id.* In 2013, the legislature abrogated the original requirement that the oral statement by the person seeking the warrant be transcribed. Or Laws 2013, ch 225, § 1. Finally, in 2019, the legislature permitted an electronic signature on an electronic affidavit to which an affiant swears by telephone. Or Laws 2019, ch 399, § 7.

In sum, technological and legislative changes since *Brown* have made it faster and easier to obtain warrants. Now, it is possible for warrant applications to be readily prepared and reviewed from separate locations and, if probable cause exists, for warrants to be quickly issued.[11] The technological changes that *Brown* anticipated have occurred. Consequently, we can no longer assume, as the *Brown* court did, that, as a general matter, it is impracticable for officers to obtain warrants to seize and search vehicles that they stop.[12]

---

[11] In many cases, an officer's reasons for believing that probable cause exists for seizure and search of a vehicle that was mobile when stopped can be quickly and clearly relayed to a magistrate. Such seizures and searches are often based on an officer's observations during a traffic stop, which are likely to be simple and few. Consequently, the time-consuming processes of drafting and reviewing that the state's witnesses described in this case are more complex than necessary for many warrants. Indeed, when the court in *Brown* described the warrant process that it believed would eliminate the need for warrantless seizures and searches, it described a process involving telephonic warrant applications, not written ones.

To be sure, in some cases the facts underlying an officer's probable cause determination are based on observations over a longer period of time and are more complex, such as when an automobile seizure and search is conducted based on information gathered over the course of a long-term investigation. But that does not necessarily support retention of the *per se* exigency exception because, in the course of a long-term investigation, officers are likely to have time to apply for a warrant.

[12] The experiences of law enforcement agencies that use telephonic or electronic warrants show that such warrants are practicable and save agencies time and other resources. *See, e.g.*, Jason Bergreen, *Utah Cops Praise Electronic Warrant System*, Salt Lake Trib. (Dec 26, 2008), https://www.police1.com/fugitive/articles/utah-cops-praise-electronic-warrant-system-umEE2WsodJ9mNKhv/ (reporting that officers using Utah's e-warrant process say it saves time, is easy

F.    *Conclusion Regarding* Brown

        For all the reasons discussed above, we conclude that it is necessary to overrule *Brown*'s *per se* exigency exception. The exception was not well founded or clearly reasoned; it was not intended to be permanent; it has not provided stability or clarity; it is inconsistent with other, more recent cases; given technological changes, it is no longer justified; and maintaining it might well diminish the incentives for jurisdictions to improve warrant processes and for officers to seek warrants when practicable.

        Therefore, in order to justify a warrantless seizure or search of a vehicle based on exigent circumstances, the state must prove that exigent circumstances actually existed at the time of the seizure or the search, each of which must be separately analyzed. That is, it must prove that there was a situation requiring swift action "to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *Stevens*, 311 Or at 126.

        To prove that such an exigency existed, the state must prove that it could not obtain a warrant through reasonable steps, which include utilizing available processes for electronic warrants. Officers "cannot create exigent circumstances by [their] own inaction." *Matsen/Wilson*, 287 Or at 587 (internal quotation marks omitted); *see also id.* ("The police cannot weave together a web of information, then claim exigent circumstances when the suspect arrives and can conveniently be snared."). Similarly, law enforcement agencies and courts cannot create exigent circumstances by failing to take reasonable steps to develop warrant processes that protect against the "invasion of the rights of a citizen," *Brown*, 301 Or at 278 n 6, that results from an unnecessarily cumbersome warrant process.

---

to use, and improves investigations); Heather R. Cotter, *How the Traditional Warrant Process Impacts Officer Safety and a PD's Budget*, Police1.com (Aug 29, 2018), https://www.police1.com/police-products/ewarrants/articles/how-the-traditional-warrant-process-impacts-officer-safety-and-a-pds-budget-rm0581PPArV-JGtYX/ (discussing the benefits to police officers of e-warrants, including improved officer safety, greater data integrity, and significant long-term cost savings).

If an exigency exists, it may justify the seizure of a vehicle. But the seizure itself may eliminate any exigency that would justify proceeding further without a warrant. Once officers have seized a vehicle, their control over it may eliminate the need to search it before a warrant application can be processed.

G. *Application*

Having concluded that the state must demonstrate an actual exigency, we return to the facts of this case. On review, we are bound by the facts found by the trial court if there is evidence in the record to support them. *Bliss*, 363 Or at 428.

The evidence before the trial court was that the stop occurred on a Monday afternoon. Multiple officers were at the scene and each of them used a telephone during the stop to communicate with others who were not present. The truck was legally parked in a parking lot, and defendant was in custody.

The trial court concluded that the state had failed to show that there was an exigency. It explained that the "state presented no evidence that anyone would move the automobile from the scene while the police sought judicial authorization for the search." It also explained that the state's witness had failed to "adequately explain why the police could not observe the vehicle during the period of time needed to obtain a warrant and seize the vehicle only if there was an attempt to move the vehicle." And, it explained that the state had failed to prove that it could not have obtained a warrant, commenting that it was "unreasonable under the circumstances in this case that no one even considered the idea of calling a judge from the site of the traffic stop to seek judicial authorization."

The state presented evidence that it would take the officers four to five hours to obtain a warrant and that the officers did not know how to seek a telephonic warrant. But the trial court rejected the argument that it was imprac-tical for the state to obtain a warrant, noting the ubiquity of cellphones, the statutory process for obtaining telephonic

warrants, and the number of judges and judicial officers in the county.

The trial court's factual findings are supported by the record and its legal conclusions are correct. The state failed to establish that exigent circumstances actually existed at the time of the warrantless search. Therefore, the trial court correctly granted defendant's motion to suppress.

The decision of the Court of Appeals is reversed. The order of the circuit court is affirmed.